784 So.2d 660 (2001)
Deborah WICKER, Individually and as Natural Tutrix of Damon Kendell Wicker
v.
HARMONY CORPORATION, et al.
Deborah Wicker, Individually and as Natural Tutrix of Damon Kendell Wicker
v.
Harmony Corporation, et al.
Nos. 2000 CA 0231, 2000 CA 0232.
Court of Appeal of Louisiana, First Circuit.
March 28, 2001.
Rehearing Denied May 14, 2001.
*662 Rick A. Caballero, Randolph A. Piedrahita, Baton Rouge, Counsel for Plaintiff/Appellant, Deborah Wicker, Individually and as natural tutrix of Damon Kendell Wicker.
L. Stephen Rastains, Ken J. Stewart, Baton Rouge, Counsel for Natalia Wicker, et al.
James H. Gibson, William H. Parker, III, Lafayette, Counsel for Formosa Plastics Corp.
Joseph A. Schittone, Baton Rouge, Counsel for Nalco Chemical Company.
Daniel R. Atkinson, Sr., Baton Rouge, Counsel for Defendant/Appellee, Harmony Corporation.
Before: WHIPPLE, KUHN and DOWNING, JJ.
DOWNING, J.
Kenneth Wicker,[1] an employee of Formosa Plastics at its plant in Baton Rouge, sustained injuries causing his death while he was prepping a leaking pipe for repair. Harmony Corporation, appellee herein, had a maintenance contract with Formosa and was responsible for repairing the leaking pipe. Plaintiffs alleged that Harmony owed a duty to protect or at least to warn Wicker of the dangers associated with these repairs. Harmony moved for a summary judgment arguing that plaintiffs could not recover under the facts applicable to this case. The trial court granted the motion for summary judgment on October 25, 1999; judgment was signed November 30, 1999. We reverse.

FACTS
During the weekend prior to the accident, a small leak occurred in a pipe conducting sulfuric acid at the Wastewater Treatment Plant (commonly called the Bioplant) area of Formosa Chemical. A plastic bucket had been put under the leak to catch the dripping acid. David Pania, the Formosa shift supervisor, ordered the pipe repaired the following Monday morning.
Pania contacted Formosa maintenance supervisor, Bill Hammonds, to oversee the project and issued a work order[2] authorizing the repair. Pania assigned a Formosa employee, Wicker, to "prepare the line for maintenance" which meant shutting down the pumps, isolating the leaking section of line, and draining it. After this task had been completed by Formosa, the Harmony maintenance crew could begin repairing *663 the pipe. David Dedon, a Harmony maintenance employee, was assigned this job.
In his deposition, Dedon confirmed that while he was going to a location to gather tools needed for the pipe repair, he saw Wicker in the area coming from an antifoam drum. Some of the anti-foam was allegedly in the bucket Wicker was carrying. Dedon and Wicker conversed for a few minutes. Dedon proceeded on his way to get his repair tools and Wicker continued on his way to tend the leaking pipe. Dedon could see Wicker was not wearing any protective clothing such as a face shield, rubber gloves or boots at any time preceding or during this incident.
Wicker picked up the plastic bucket sitting under the dripping pipe collecting the acid. He poured the acid solution into the bucket he was already carrying which allegedly contained the anti-foam. Apparently, Wicker intended to dump this mixture in an "aeration tank" nearby. As Wicker was walking toward the tank, the bucket he was carrying exploded. Dedon stated that although he was nearby, he did not see the accident but did hear Wicker "holler" and ran to help. Dedon, Pania and other employees spoke to Wicker immediately following the explosion and he told them that there was probably "anti-foam" already in his bucket. Wicker speculated that combining the products must have caused the explosion.
After being administered emergency aid,[3] Wicker was taken to Baton Rouge General Hospital Burn Unit where he died several days later.

PROCEDURAL HISTORY
Plaintiffs filed suit April 18, 1994. The trial court granted Harmony's Motion for Summary Judgment on October 25, 1999; judgment was signed November 30, 1999. The trial court's oral reasons stated that plaintiffs had not brought forward any evidence which raised a genuine issue of material fact showing that Harmony breached a duty either legal or assumed. We disagree.

DISCUSSION
The initial determination on a motion for summary judgment is whether the supporting documents presented by the moving party are sufficient to resolve all material issues of fact. If they are not sufficient, summary judgment should be denied. Babin v. First Energy Corp., 96-1232, pp. 1-2 (La.App. 1 Cir. 3/27/97), 693 So.2d 813, 817-818, (on rehearing). "To satisfy this burden, the mover must meet a strict standard of showing that it is quite clear as to what is the truth and that there has been excluded any real doubt as to the existence of a genuine issue of material fact." Industrial Sand and Abrasives, Inc. v. Louisville and Nashville Railroad Co., 427 So.2d 1152, 1154 (La.1983).
Appellate courts review summary judgments de novo under the same criteria that govern the district court's consideration of whether summary judgment is appropriate. Potter v. First Federal Sav. and Loan Ass'n at Scotlandville, 615 So.2d 318, 325 (La.1993).
A motion for summary should be granted if the pleadings, depositions, answers together with affidavits show that there exists no genuine issue as to any material fact and that the mover is entitled to judgment as a matter of law. La.Code Civ. P. art 966.
*664 The first issue that must be addressed in reviewing a trial court's grant of summary judgment is whether any genuine issues of material fact exist. Smith v. Our Lady of Lake Hospital, Inc., 93-2512, p. 28 (La.7/5/94), 639 So.2d 730, 752. The reviewing court must next address whether reasonable minds could conclude, based on the facts presented, the mover is entitled to judgment. Id. In other words, summary judgment is appropriate when all relevant facts are brought before the court, the relevant facts are undisputed, and the sole issue remaining is the conclusion to be drawn from the relevant facts. Id.
The 1996 amendment to the summary judgment provision changed existing law by declaring that summary judgments are now favored. The amendment did not change the existing law and jurisprudence concerning genuine issues of material fact and the burden of proof applied to a summary judgment proceeding. Scott v. McDaniel, 96-1509, p. 5 (La.App. 1 Cir.5/9/97), 694 So.2d 1189, 1191, writ denied, 97-1551 (La.9/26/97), 701 So.2d 991. The burden is still on mover to show there is no genuine issue of material fact and that the mover is entitled to judgment as a matter of law.

CONTRACTUAL DUTY
The single issue in this case is whether Harmony breached a duty to a Formosa employee working in the same area, to take any affirmative action such as to warn the employee of a known dangerous situation. It should be noted that Formosa and Harmony had entered into a contract which provided in pertinent part:
Contractor [Harmony] ... shall take all necessary precautions for the safety of employees on the Work and shall comply with all safety rules and regulations of Owner as set forth in the Formosa Plastics Group Safety and Health Policy ... and all applicable provisions of the Federal, State and Local safety laws and building codes to prevent accidents or injuries to persons or damage to property on or about or adjacent to the premises where Work is being performed. (Emphasis added.)
The contract provides that Harmony will take "all necessary safety precautions for the safety of the employees on the Work." This language very specifically places an expansive burden of safety on Harmony.
David Dedon is a millwright employed by Harmony to perform the repairs at the Formosa plant. Bill Hammonds, a Formosa employee, gave Dedon his day-to-day instructions. Hammonds ordered Dedon to repair the leaking pipe. Dedon admitted that he went back to the site of the leaking pipe and saw that a plastic bucket had been placed under the pipe to collect the dripping acid. This practice was prohibited by the safety regulation manual. Dedon testified that he saw Wicker actually transporting anti-foam material in a five gallon bucket.
Harmony argues that neither Harmony nor its employee Dedon had a duty to warn Wicker of any unsafe practice that Dedon may have observed, such as Wicker's failure to have on safety equipment. The contract language we have cited is broad enough to impose a duty on Harmony employees to warn others of safety violations which may result in injury. Whether Dedon was sufficiently knowledgeable and sufficiently proximate to Wicker such that he would be bound by the duty to intervene and take some action to benefit Wicker is a question of fact. The trial court never addressed this question because it erroneously found there was no duty. This determination would be an issue of credibility that cannot be resolved *665 in a motion for summary judgment. Independent Fire Insurance Company v. Sunbeam Corporation. 99-2181, 99-2257, p. 16 (La.2/29/00), 755 So.2d 226, 236.

DUTY TO RESCUE
According to a 1999 Pepperdine Law Review article entitled No Duty to Rescue: Can Americans Really Leave A Victim Lying In The Street? What is Left of the American Rule, and Will It Survive Unabated?[4], the fundamental rule of American common law, tort law is that there is no general duty to go to the rescue of a person who is in peril. By contrast in most civil law countries, such as France, when a person without danger to himself or others could provide aid to another and rescue him or her in distress, he could be subject to liability if he failed to do so. Under French law, the victims of the accident can bring a claim for the failure to rescue because a third party did not at lease seek medical attention or at lease call the police. In France the punishment for violation of this law is severe and is almost always carried out. Id. Under French law, a citizen can receive up to five years in prison for failing to rescue. The difference between these two philosophies is that the majority of America's legal system is based on English common law, which is highly individualistic and against selective enforcement. France's civil law derives from Roman law, and is based on the Napoleonic Code. Civil law prizes "social solidarity ... over individual choice". Id. at p. 370.
The history of the "No Duty to Rescue Rule" is reviewed in an article in the Winter 1997 DePaul Law Review entitled, Recognizing the Importance of Remoteness to the Duty to Rescue[5], 46 DePaul L. Rev. 315, 317. The "No Duty to Rescue Rule" is a common law jurisprudentially created rule generally known as the "American Rule." The "American Rule" has been severely criticized over the years. The standard law school example has been that of a person watching someone drown without having any obligation to help them. This behavior is no less shocking than the cases cited in these above law review articles.
Louisiana courts have cited the common law "American Rule," without comment. The court in Marsalis v. LaSalle, 94 So.2d 120, 124 (La.App.Orleans 1957), cites 65 C.J.S., Negligence, § 57, and some cases from common law states. The Court then gives an example of a two-year-old child about to be run over by a train and states the common law rule that a person who could easily save the child and does not might be styled a "ruthless monster" but he has no liability for the child's death. This concept is repugnant and there is no basis in Louisiana law to adopt this uncivilized common law concept. As Justice Sanders stated in his dissent in Lee v. Peerless Ins. Co., 183 So.2d 328, 335, 248 La. 982, (1966), overruled on other grounds, Pence v. Ketchum, 326 So.2d 831 (La.1976), overruled, Thrasher v. Leggett, 373 So.2d 494 (La.1979).
I do not agree that we are bound by the common law rule. But if we must summon a common law rule to our assistance, we should first determine whether the rule is sound.
Louisiana should not follow the common law "American Rule", but should follow *666 other civil law countries in establishing a "duty to rescue." A person who observes a person in obvious peril should be required to render assistance when he can do so without personal risk. The common motto in industry is, "Safety is everybody's business." Sometimes, as in this case, a worker, who should know better, inadvertently puts himself in peril. Although the duty is slight, a co-worker should be expected to warn others of known imminent dangers, as this duty is an infinitesimal imposition which could avoid grave consequences. When balancing the utility of this duty against the risks of potentially grave consequences, we conclude the common law rule is barbarous and uncivilized.
However, because we have found that Harmony contractually assumed a duty in this case, it is not necessary for the Court to adopt a "Duty to Rescue" doctrine at this time.

CONCLUSION
For the foregoing reasons, the judgment on appeal is reversed and the matter is remanded for further proceedings. Costs of this appeal are assessed against the appellee, Harmony Construction, Inc.
REVERSED AND REMANDED.
KUHN, J. concurs.
WHIPPLE, J., concurs for reasons assigned.
WHIPPLE, J., concurring.
I agree with the result reached by the majority in this case. I agree that the contract language cited by the majority imposed a duty on Harmony employees to warn others, including the decedent herein, and to take all reasonably necessary steps to avoid safety violations which could result in injury. The issue of whether the Harmony employee, Mr. Dedon, violated his employer's contractually-assumed duty to "take all necessary precautions for the safety of employees [at the work site]" and to "comply with all safety rules" involves the resolution of numerous issues of fact which are inappropriate in a summary judgment proceeding. Thus, I concur in the result herein.
NOTES
[1] Kenneth Wicker died April 28, 1993 as a result of the April 19, 1993 accident at issue herein. His legal representatives filed suit April 18, 1994 and subsequently filed a devolutive appeal on December 3, 1999.
[2] A work order is an internal device which is required before a repair order given to Harmony can proceed. Formosa Operations Division was responsible for issuing this permit as well as specifying the safety equipment required for the repair.
[3] Wicker was put into a tub filled with bicarbonates and water used specifically for acid burn victims.
[4] Jennifer L. Groninger, No Duty to Rescue, Can Americans Really Leave a Victim Lying In The Street? What is Left of the American Rule, and Will It Survive Unabated? 26 Pepperdine L. Rev. 353.
[5] Peter F. Lake, Recognizing the Importance of Remoteness to the Duty to Rescue, 46 DePaul L. Rev. 315, 317 (Winter 1997).