931 So.2d 420 (2006)
Rebecca COOK and Vernon Shively, Plaintiffs-Appellants
v.
Cynthia Lynn KENDRICK and State Farm Fire & Casualty Company, Defendants-Appellees.
No. 41,061-CA.
Court of Appeal of Louisiana, Second Circuit.
May 19, 2006.
Rehearing Denied June 23, 2006.
*422 Fisher & McMahon by Mark K. Manno, for Appellants.
Casten & Pearce by Marshall R. Pearce, H. Lynwood Lawrence, Jr., Shreveport, for Appellee Cynthia Lynn Kendrick.
Tutt, Stroud & Bordelon by Charles G. Tutt, Jennifer P. McKay, Shreveport, for Appellee State Farm Fire & Casualty Co.
Before WILLIAMS, CARAWAY and LOLLEY, JJ.
LOLLEY, J.
In this wrongful death lawsuit, Rebecca Cook and Vernon Shively appeal a judgment of the First Judicial District Court, Parish of Caddo, State of Louisiana, which, following a jury trial, assessed 80% comparative fault to Ragan Shively and 20% comparative fault to Cynthia Lynn Kendrick *423 for Ragan's death. Kendrick and her insurer, State Farm Fire and Casualty Company, both answer the appeal. For the following reasons, we affirm the judgment of the trial court.

FACTS
Ragan Shively died on April 5, 2002, of a drug overdose, while at the home of his friend, herein defendant, Cynthia Lynn Kendrick. Ragan was the son of the plaintiffs, Rebecca Cook and Vernon Shively, and at the time of his death, he was twenty-two years old.
Ragan spent the day before his death at Kendrick's home. She was typing a paper for him, and he was mowing her lawn and hanging out. Later that evening, Ragan's friend, Jennifer Rhodes, came over to Kendrick's home after an evening of drinking and shooting pool. At the trial, Kendrick testified that Jennifer was obviously intoxicated, and Nathan Shively, Ragan's brother, confirmed that. Ragan and Jennifer left Kendrick's home and returned around 2:00 a.m. According to Jennifer, Ragan "passed out" in his food. She attempted to rouse him and got him to the kitchen to drink coffee. Jennifer claimed he was sitting on the floor against the kitchen cabinets, and later fell onto the floor, where she and Kendrick let him stay.
Both Jennifer and Kendrick testified that they were not concerned about Ragan's condition until early the next morning, when they were unable to rouse him and saw blood coming from his mouth. Kendrick called Nathan, who was one year older than Ragan, and Nathan called 911. The 911 operator called Kendrick's home and instructed her on performing CPR on Nathan, which Kendrick did. All of this occurred within minutes. Nathan arrived at Kendrick's house, at the about the same time as the paramedics did. The paramedics worked to resuscitate Ragan, unsuccessfully, and transported him to the emergency room, where he was pronounced dead. A subsequent autopsy of Ragan confirmed that he died of a drug overdose, and according to that report the following drugs were found in his system: carisoprodol (Soma); cocaine; diazepam (Valium); Xanax; methadone; and, diphenhydramine (Benadryl). The coroner, Dr. George McCormick, testified that it was a combination, or interaction, of these drugs which ultimately killed Ragan there was not one drug responsible for his death.
Detective Lane Smith of the Shreveport Police Department investigated Ragan's death. At trial he testified that Kendrick was cooperative in his investigation and actually turned over some drugs to him. Kendrick informed Det. Smith that Ragan had been unconscious from around 2:00-3:00 a.m., and she realized there was problem at approximately 6:00 a.m.
Following an investigation of the matter, Rebecca Cook and Vernon Shively (collectively, "appellants") filed a wrongful death lawsuit against Kendrick and her insurer, State Farm Fire and Casualty Company ("State Farm"). Following the trial, the jury returned its verdict finding Kendrick 20% at fault for Ragan's deathRagan was found to be 80% at fault for his death. The jury awarded Cook and Shively each $1.00 in general damages and further awarded Shively $11,602.35 for funeral and burial expenses and medical expenses. Additionally, the jury specifically determined that Kendrick did not consciously desire Ragan's death, or knew that his death "was substantially certain to result from her conduct." Cook and Shively filed a motion for judgment notwithstanding the verdict, which was denied. Judgment was entered pursuant to the jury verdict, and this appeal by Cook and Shively ensued. Kendrick and State Farm have each answered the appeal.

*424 DISCUSSION

General Damages
In their first assignment of error, the appellants argue that the jury erred in awarding them general damages of only $1.00 each for Ragan's death. Specifically, the appellants, relying on this court's previous opinion in Greene v. Fox Crossing, Inc., 32,774 (La.App. 2d Cir.03/01/00), 754 So.2d 339, writ denied, XXXX-XXXX (La.05/26/00), 762 So.2d 1108, argue that it was legal error for the jury to award special damages and to virtually deny any general damages. We disagree, and in so doing, reverse this court's previous position as stated in Greene, supra.
Shortly after the rendering of Greene, supra, the Louisiana Supreme Court addressed this precise issue in Wainwright v. Fontenot, XXXX-XXXX (La.10/17/00), 774 So.2d 70. Initially, the Wainwright court noted that:
The assessment of "quantum," or the appropriate amount of damages, by a trial judge or jury is a determination of fact, one entitled to great deference on review. As such, "the role of an appellate court in reviewing general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trier of fact."
Moreover, before a Court of Appeal can disturb an award made by a [factfinder,] the record must clearly reveal that the trier of fact abused its discretion in making its award. Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court.
Id. at 75 (citations omitted).
Based on this primary premise, the Wainwright court concluded that it was not, per se, error for a jury to award a plaintiff special damages, but not to award general damages. Rather than performing a de novo review in such a situation, the supreme court held that the proper course of action is for the reviewing court to first determine whether the factfinder's "determination that the plaintiff is entitled to [special damages] but not to general damages is so inconsistent as to constitute an abuse of discretion. Only after the reviewing court determines that the factfinder has abused its much discretion can that court conduct a de novo review of the record." Id. at 76. The supreme court surmised that:
[A] jury, in the exercise of its discretion as factfinder, can reasonably reach the conclusion that a plaintiff has proven his entitlement to recovery of certain [special damages], yet failed to prove that he endured compensable pain and suffering as a result of defendant's fault. It may often be the case that such a verdict may not withstand review under the abuse of discretion standard. However, it would be inconsistent with the great deference afforded the factfinder by this court and our jurisprudence to state that, as a matter of law, such a verdict must always be erroneous. Rather, a reviewing court faced with a verdict such as the one before us must ask whether the jury's determination that plaintiff is entitled to certain medical expenses but not to general damages is so inconsistent as to constitute an abuse of discretion.
Id. at 76.
Here, we cannot say that the jury's failure to award the appellants general damages more than $1.00 was an abuse of its vast discretion. Notably, the plaintiff, in a suit for damages, has the *425 burden of proving the damages suffered as a result of a defendant's fault. Wainwright, supra at 77, citing, Brannan v. Wyeth Laboratories, Inc., 526 So.2d 1101 (La.1988). Furthermore, the jury also heard and observed Cook and Shively as they testified at trial. The jury was in a superior position to observe the nuances of their demeanor which are not revealed in a cold record. See Miller v. Clout, XXXX-XXXX (La.10/21/03), 857 So.2d 458. Thus, in this case, we conclude that the jury was well within its discretion in determining that the appellants failed to prove any real general damages.
We recognize the natural love the appellants had for their youngest son; however, we must determine whether they suffered compensable pain and suffering as a result of Ragan's death, which is not a reflection on how much they might have loved their son. Here, there is little evidence regarding the relationship they had with Ragan prior to their divorce in or about 1996. However, after the divorce, when Ragan was around 15 or 16 years old, the record is apparent that little parental attention was paid to Ragan, especially as it concerned his ongoing dependence on drugs.
After Vernon and Rebecca divorced, Vernon remained in the family home and Rebecca moved outthe boys stayed with Vernon. Around 1998 (when Ragan was 18 years old), Vernon began working in Houston. Nathan and Ragan remained in the family home alone. Vernon would come home occasionally on the weekends, but in 2000, he moved to Houston permanently. Rebecca had moved to Blanchard, Louisiana with her second husband and his children. The record is clear that there was little parental authority over Ragan or Nathan. Ragan's girlfriend at the time, a sophomore or junior in high school, actually moved in and lived with Ragan in the house, something which neither Vernon or Rebecca had a problem with. The family home became the teenager/young adult party house, with a room designated as the "drunk tank."
Along with that loose environment came drugs. Vernon admitted that both Nathan and Ragan used drugs, and according to Nathan, Ragan "experimented with a lot of different drugs as a teenager." A childhood friend of Ragan's, Dustin Jones, testified that it was during this time period that Vernon found some of their drug paraphernalia and ran over it with his car. Vernon left the remains on the kitchen counter, which the boys found because they were skipping school. Vernon never discussed it with Dustin (and apparently never informed his parents, because Dustin never heard anything more about the incident). However, even though this incident occurred while Ragan was still in high school, it was not until 2002 when Ragan approached his parents, that they were aware of his drug dependency.
Vernon testified that he immediately contacted Dr. John Epling, a physician specializing in addiction medicine, once Ragan admitted to his parents he was addicted to pain medication. According to Dr. Epling, he saw Ragan between January 17, 2002 and February 6, 2002, after which, he never saw Ragan again. Vernon testified that he did not know that Ragan continued to use drugs while he saw Dr. Epling, nor did he even know that Ragan had stopped seeing Dr. Epling. Rebecca testified that the week Ragan died, she told Kendrick that Ragan was seeing Dr. Epling for his drug addictionobviously, she had no idea that Ragan had aborted his rehabilitation.
Although it sounds harsh, such testimony begs the question, where were Vernon and Rebecca when Ragan needed them mostduring this critical time period leading up to his drug overdose? Granted, *426 they assisted Ragan in receiving initial medical attention, but there is no indication that they had any other involvement in his rehabilitation process. Notably, Ragan was legally an adultbut, Vernon and Rebecca still supported him financially. Moreover, Ragan was a young, seemingly immature, and drug-addicted adult, who could have used more parental involvement in his rehabilitation from seriously addictive drugs. Whereas, appellants characterize the jury's finding as a failure to "like" them and/or Ragan, we do not see such a subjective indication in the record, which, instead, objectively shows that Vernon and Rebecca turned a blind eye to Ragan's drug addiction and exercised little parental authority, and perhaps concern, over Ragan's activities. That is, until he sadly died. As tragic as the loss of any young life to drugs is, in this instance and considering the particular facts of this case, we cannot say that the jury's determination that the appellants failed to prove compensable general damages for pain and suffering was an abuse of discretion.

Motion for JNOV
Appellants bring two assignments of error related to the trial court's denial of their motion for judgment notwithstanding the verdict. First, they argue that the trial court erred in denying the motion for JNOV, because, appellants argue, the jury committed legal error in awarding special damages but basically denying them any general damages. Second, they argue that the trial court applied the wrong legal standard in denying the motion.
This court recently considered the issue regarding the standard for granting of a JNOV, and stated:
A JNOV is a procedural device authorized by La. C.C.P. art. 1811 whereby the trial court may correct a legally erroneous verdict by modifying fault or damages, or both, that the jury may have assessed. If the opposing evidence is of such quality and weight that reasonable men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. To determine that the evidence was insufficient as a matter of law requires a finding that no valid line of reasoning and permissible inferences could possibly lead rational persons to the conclusions reached by the jury. The JNOV should not be granted merely when there is a preponderance of evidence for the mover. In making this determination, the trial court should not evaluate the credibility of the witnesses, and all inferences or factual questions should be resolved in favor of the non-moving party.
Tolbird v. Wyble, 38,969 (La.App. 2d Cir.12/15/04), 892 So.2d 103, writs denied, XXXX-XXXX, XXXX-XXXX (La.04/29/05), 901 So.2d 1066-67, cert. denied, ___ U.S. ___, 126 S.Ct. 387, 163 L.Ed.2d 172 (2005). In reviewing the trial court's determination regarding whether to grant a JNOV or new trial, the appellate court's review is limited to whether the trial court committed manifest error in its decision on the motions. Id.
Considering our conclusion that the jury's $1.00 general damage award was not legal error in light of the award of special damages to Vernon, the trial court did not err in denying the motion for JNOV on this basis. In other words, seeing as the jury's action in basically denying general damages but awarding special damages was not legal error, the trial court was not constrained to grant the appellants' motion for JNOV on this basis. Thus, we find no error by the trial court as to this issue.
Moreover, considering the great deference a trial court must afford a jury's verdict in ruling on a motion for JNOV, our review of the record does not show an *427 abuse of discretion by the trial court in concluding that the weight of the evidence considered by this jury led to its ultimate conclusion and verdict against the appellants on the issue of general damages. Consequently, the trial court properly deferred to the jury to ensure that substantial justice, in this case, was accomplished and properly denied the motion for JNOV. See Tolbird, supra at 107.

Determination of negligence and apportionment of comparative fault
All of the parties weigh in as to the trial court's determination that Ragan and Kendrick shared liability for Ragan's death and the apportionment of comparative fault between them. As stated herein, at the conclusion of the trial, the jury assessed Ragan with 80% of the fault for his death and Kendrick with 20%. In their final assignment of error, Vernon and Rebecca claim that the jury committed manifest error in assessing Kendrick with only 20% of the fault, stating that she should have been assessed with 80% fault. Both Kendrick and her insurer, State Farm, have answered the appeal, arguing that the jury erred in assessing her with any fault in Ragan's death.

Kendrick's negligence
Before we can even consider the issue of allocation of fault, we must determine whether the jury correctly found Kendrick liable for Ragan's death. In their respective answers to appeal, Kendrick and State Farm argue that the jury erred in making such a determination. We disagree.
Louisiana applies a duty-risk analysis to determine whether liability exists under the particular facts presented. The plaintiff must prove that the conduct in question was the cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant, and the risk of harm was within the scope of the protection afforded by the duty breached. Cardella v. Robinson, 39,663 (La.App. 2d Cir.05/13/05), 903 So.2d 613, writ denied, XXXX-XXXX (La.01/09/06), 918 So.2d 1047.
Here, the appellants focus on Kendrick's conduct, which they argue caused Ragan's death and made Kendrick negligent in two ways: (1) in giving drugs to Ragan, and (2) in failing to call for assistance in sufficient time to have prevented Ragan's death. A party's conduct is a cause-in-fact of the harm if it was a substantial factor in bringing about the harm. Lasyone v. Kansas City Southern R.R., 2000-2628 (La.04/03/01), 786 So.2d 682. While a party's conduct does not have to be the sole cause of the harm, it is a necessary antecedent essential to an assessment of liability. Id. Whether an action is the cause-in-fact of the harm is essentially a factual determination that is usually left for the factfinder. Id. As such, it is subject to a manifest error standard of review.
Kendrick was determined to be liable for Ragan's death; however, the record does not provide us with reasons behind the jury's verdict. We can only surmise that the jury considered (1) Kendrick's conduct as it related to the use of drugs and alcohol in her home by her, Ragan and others and, (2) her action and/or inaction regarding Ragan's unconscious condition and the timeliness of her call for help. Clearly, from the evidence presented at trial, the jury could have determined Kendrick's conduct, in both ways or maybe either way, led to Ragan's death. Our review of the record indicates no error on the part of the jury in ultimately concluding that Kendrick's conduct in some way contributed to Ragan's death.
*428 In their answer to the appellants' appeal, Kendrick and State Farm argue that Kendrick could not have been liable for Ragan's death, because she did not have a legal duty to Ragan. Both parties argue that Louisiana law generally does not impose upon individuals a legal duty to render aid to others, except where a "special relationship" exists so as to create a duty.[1] However, we disagree that under the particular facts of this case, she had no legal duty to render aid to Ragan.
Relying on the case law cited by Kendrick and State Farm in brief, we recognize that, "[t]here is a legal recognized duty to render assistance in situations where the plaintiff's peril or injury is due to the negligence on the part of the defendant. . . ." Strickland v. Ambassador Insurance Co., 422 So.2d 1207, 1209 (La. App. 1st Cir.1982). As we have already discussed, the jury had alternative theories under which they could have found Kendrick negligentone which included that she provided Ragan with the drugs which contributed to his overdose.
Notably, Jennifer testified that Kendrick provided Ragan with Soma, a drug found in his system. Kendrick denied giving Ragan the drug, and Dr. McCormick testified that no one drug caused Ragan's overdose. However, even if you dismiss Jennifer's testimony, the jury heard testimony that Kendrick obviously had a laissez faire attitude about drugs and alcohol in her homeeven though she evidently knew that Ragan was trying to undergo treatment for his addiction. The jury also was faced with evidence that Kendrick actually had drugs in her house and car (her possession of Xanax without a prescription even led to her arrest). Although we do not know exactly what conduct of Kendrick's the jury believed led to Ragan's death, clearly, the jury could have determined that Ragan was in an unconscious state from a drug overdose that Kendrick negligently contributed to. If so, then as suggested by Strickland, she would have had a duty to render assistance to him since she possibly placed him in "peril or injury."
Kendrick further argues that even if she had a duty to render aid to Ragan, said duty was not breached because her conduct conformed to the standard of the reasonable man. Although the issue of whether a defendant owes a duty is a question of law, the successive question of whether that duty was breached is a question of fact. Rowe v. Schumpert Medical Center, 26,334 (La.App. 2d Cir.12/07/94), 647 So.2d 390, writ denied, 95-0075 (La.03/17/95), 651 So.2d 268, citing Mundy v. Department of Health and Human Resources, 620 So.2d 811 (La.1993); Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984). The jury heard the testimony of Kendrick and Jennifer regarding the events of that late evening/early morning. Considering the evidence presented to the jury, we cannot say that is was manifestly erroneous in its apparent conclusion that Kendrick breached her duty.

Apportionment of fault
All of the parties take issue with the trial court's apportionment of fault in *429 this case. However, regarding the respective acts and duties of the parties involved, and after a careful review of the record, we find no manifest error in the jury's assessment of comparative fault for the following reasons.
The trier of fact will compare the relative fault of the parties in the assessment of liability. Thomas v. Sisters of Charity of the Incarnate Word, 38,170 (La.App. 2d Cir.03/19/04), 870 So.2d 390, writ denied, XXXX-XXXX (La.09/24/04), 882 So.2d 1132, citing Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985). In assessing comparative fault, the following factors should be considered: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Thomas, supra. The trier of fact's allocation of fault is a factual determination subject to the manifest error rule. Id.
Clearly, after determining that Kendrick was negligent, the jury weighed the Watson factors to determine what degree of fault she was responsible for. However, the jury felt that Ragan bore the majority of the fault for his death, which we do not conclude was in error. Apportionment of a great percentage of fault to Ragan does not reflect a dislike of Ragan by the jury, as claimed by the appellants; instead, the record clearly supports the jury's conclusion that ultimately Ragan was the most responsible for his own death. Ragan was an adult, albeit young, whose long-term drug habit had apparently spiraled out of control, something that the record shows he had not come to terms with. His friend, Dustin, testified that Ragan was "pretty much [on drugs] every time" he saw him. In fact, Dustin saw Ragan mowing Kendrick's grass the day before his death, and believed Ragan was under the influence of drugs then. Further, as testified to by Dr. Epling, Ragan tried to convince the doctor that he was in withdrawal so he could get more drugs. Additionally, Ragan resisted Dr. Epling's recommendation for more intense residential treatment for his drug use, and Ragan ceased visitations with Dr. Epling. Although sad, it is evident that Ragan was the most responsible for his ultimate death by drug overdose, and the jury did not err in attributing 80% of the fault to him.
As to Kendrick's role in Ragan's death, the jury obviously weighed the evidence and reached a conclusion, as discussed herein, that she acted negligently. After making that initial determination, the jury was faced with determining what degree of fault she shared with Ragan. Considering the evidence of record and the Watson factors, we cannot say that the jury committed manifest error in assessing Kendrick with 20% of the fault. As discussed, Kendrick apparently had a relaxed attitude toward drugs and had a variety on her property. However, the jury also heard testimony by the investigating officer that Kendrick was cooperative in his investigation, and even led him to the Xanax she had in her car. Additionally, the jury obviously assessed the actions taken by Kendrick when she discovered Ragan in an unconscious state, including the fact that he had been passed out for some time on her floor. In this regard, factors that could have been considered by the jury were Kendrick's age, experience, and relationship with Ragan (she had been described as being almost a mother to Ragan). When faced with weighing all the troubling facts in this case, and after concluding *430 Kendrick was negligent, it was not a clear abuse of discretion for the jury to have found Kendrick 20% at fault for Ragan's death.

Insurance coverage
In its answer to the appeal, State Farm argues that pursuant to Louisiana's Drug Dealer Act, La. R.S. 9:2800.61 et seq. (the "Act") it is prohibited from defending and paying damages for Kendrick. Additionally, State Farm maintains that Kendrick's actions were intentional, and thus would be excluded from liability insurance coverage under her policy.

Drug Dealer Liability Act
State Farm correctly maintains that pursuant to La. R.S. 9:2800.65, it would be barred from paying damages or providing a defense for Kendrick had the action against Kendrick been brought under the Louisiana Drug Dealer Liability Act. However, the appellants did not bring their action against Kendrick pursuant to the Acttheir claims against Kendrick were in tort, pursuant to La. C.C. arts. 2315 and 2315.2, which was a choice within their discretion. They were not legally bound to bring their claims against Kendrick under the Act.
The starting point in interpreting any statute is the language of the statute itself. Moss v. State, XXXX-XXXX (La.04/04/06), 925 So.2d 1185. Louisiana R.S. 1:3 states that, "the word `shall' is mandatory and the word `may' is permissive." Notably, as pointed out by the appellants, the Act employs the use of the permissive "may" rather than the mandatory "shall" in describing the employment of the Act as a cause of action. La. R.S. 9:2800.63. The Act is unlike the Louisiana Medical Malpractice Act, which uses mandatory language requiring the allegedly injured party's compliance with the act. Thus, we conclude that under the clear language of the Act, alternative theories of recovery, as such, are provided under La. C.C. arts. 2315 and 2315.2, are not barred, and appellants were not required to bring their cause of action against Kendrick pursuant to the Act. Thus, there was no prohibition against insurance coverage for this reason as argued by State Farm.

Intentional act exclusion
State Farm also argues that pursuant to Kendrick's insurance policy, she is not entitled to coverage because her actions were intentional and her policy included an exclusion for intentional acts by the insured. First, we note that the jury was faced with the question on the verdict form: "Do you find that, [Kendrick], either consciously desired Ragan Shively's serious injury or death; or knew that Ragan Shively's serious injury or death was substantially certain to result from her conduct." The jury answered "no," which indicates it found no intent on the part of Kendrick. Furthermore, as we have already discussed, we found no error in the jury's conclusion that Kendrick acted negligently, which further pretermits any discussion of whether her actions were intentional, as claimed by State Farm. Thus, we conclude that State Farm's assignment of error is without merit.

CONCLUSION
For the foregoing reasons, the judgment by the trial court assessing 80% comparative fault to Ragan Shively and 20% comparative fault to Cynthia Lynn Kendrick for Ragan's death is hereby affirmed. Costs of this appeal are to be shared equally by the parties.
AFFIRMED.
CARAWAY, J., concurs in part and dissents in part with written reasons.
*431 CARAWAY, J., concurring in part and dissenting in part.
I respectfully concur in part, and dissent in part.
This case presents a very close question concerning Cynthia Lynn Kendrick's negligence in causing Ragan's death. There is considerable circumstantial evidence that allows choices from opposing inferences. The record reasonably supports a view that Ragan was 100% at fault for his death by drug overdose. On the other hand, there is a reasonable view of the evidence that Kendrick partially facilitated Ragan's consumption of some of the drugs comprising the lethal mix that killed him and, after observing his collapse as a guest on her kitchen floor, failed to provide him aid that may have saved him. The jury found Kendrick to be a tortfeasor for that role and apathy. This is a very close question, but Kendrick did have a legal duty to her guest under these circumstances which the jurisprudence cited by the majority has recognized and which the jury could have determined was breached.
Kendrick was not the only party in this action that breached a duty to Ragan. The record shows that the plaintiffs also neglected their parental duties to Ragan who began his drug addictive behavior as a minor in their care. That fault of the plaintiffs, however, was not an issue in this comparative fault setting, and since Ragan was a twenty-two-year-old adult at his death, any parental fault for his teenage years was not actionable. Nevertheless, the jury's verdict awarding nothing to the parents for the loss of affection for their son appears fault-based, tantamount to a contributory negligence bar to compensation for their loss. Echoing that theme, the majority affirms the verdict emphasizing the plaintiffs' lack of "parental involvement in his rehabilitation" and their failure to exert "parental authority" during Ragan's minority.
Instead of this non-actionable parental fault, the applicable elements of the award for wrongful death in this case include the loss of love, affection and companionship. Wingfield v. State of Louisiana Dep't of Transp. & Dev., 01-2668 (La.App. 1st Cir.11/8/02), 835 So.2d 785. The record does not support the view that there were no longer any emotional ties which were regularly exercised between these parents and Ragan. There was a clear loss of some compensable affection and companionship. From another perspective, we might remove the specter of drug abuse from this action and consider that Kendrick could have been a tortfeasor that caused Ragan's death by crashing her vehicle into him as he walked down the street completely sober. With that wrongful death scenario, would anyone say that a compensable emotional loss was not suffered by these same, albeit neglectful, parents who still regularly visited their son and had recently paid for medical help to treat his addition? Though the plaintiffs' lack of attention and guidance for their son is a relevant factor in measuring the closeness of each parent's relationship with him, it was an abuse of discretion for the jury not to award some damages for their loss of love, affection and companionship in this case.
In reaching this conclusion, I find the ruling in Wainwright v. Fontenot, 00-0492 (La.10/17/00), 774 So.2d 70, clearly distinguishable. Our Supreme Court in Wainwright held that there is no per se rule requiring an award for general damages in personal injury cases when the trier-of-fact has otherwise found the defendant liable and awarded special damages. The court corrected the misstated rationale of some lower court rulings that the appellate court must always award general damages *432 as a matter of law. Instead, a trial court ruling awarding only special damages may be affirmed if there is a reasonable view of the facts that shows that the plaintiff experienced no pain and suffering or, in this case, no loss of love and affection. The court then found no abuse of discretion by the Wainwright jury in failing to award general damages. The emotionally disturbed child victim in that case, who mistakenly received an adult dosage of the drug Prozac, arguably exhibited behavior after the overdose which was no worse than the child's prior behavior. The award of special damages only to treat the overdose was appropriate.
Notably, in setting forth the correct appellate standard of review, Wainwright did not overrule the results of numerous appellate court rulings correcting trial court decisions which awarded only special damages where the undisputed facts demonstrated some pain and suffering requiring a general damage award. Wainwright's review of those cases did not dispute the results but only corrected the expressions by the lower courts of the standard of appellate review. Clearly, logic suggests that in personal injury cases with undisputed special damages in the form of medical expenses or lost wages, the occurrence of those special damages without some attendant pain and suffering will be rare. Wainwright presented such rare circumstances. In contrast, this court's ruling in Greene v. Fox Crossing, Inc., 32,774 (La. App. 2d Cir.3/1/00), 754 So.2d 339, writ denied, 00-0944 (La.5/26/00), 762 So.2d 1108, overruling the jury's denial of general damages, was unquestionably correct even though the expression of the per se rule in our opinion was improper.
Ironically, the jury awarded special damages in the amount of the funeral expenses the parents paid. Ms. Cook lived nearby, regularly saw her son and first received word of his death from the doctor at the hospital. She copied his obituary and memorial and sent them to her friends and Ragan's. Was the funeral ceremony and this mother's mourning evidence of a sham? Was the parents' relationship with their wayward son really so cold and detached? The evidence supports no reasonable view that these parents did not maintain an ongoing relationship with Ragan and did not suffer some compensable loss of love and affection.
APPLICATION FOR REHEARING
Before BROWN, WILLIAMS, CARAWAY, DREW, and LOLLEY, JJ.
Rehearing denied.
BROWN and CARAWAY, JJ., would grant rehearing.
NOTES
[1] Actually, the Louisiana First Circuit Court of Appeal has tiptoed close to imposing a duty to rescue. See Beach v. Pointe Coupee Elec. Membership Corp., 2004-2255 (La.App. 1st Cir.11/16/05), 917 So.2d 556, citing Wicker v. Harmony Corp., XXXX-XXXX (La.App. 1st Cir.03/28/01), 784 So.2d 660, writ denied, XXXX-XXXX (La.09/28/01), 798 So.2d 115. The Wicker court analyzed the common law "American Rule" that there is no legal duty to rescue versus the civil law stance imposing such a duty. The court concluded that, "When balancing the utility of this duty against the risks of potentially grave consequences,. . . the common law rule is barbarous and uncivilized." Wicker, supra at 665.