[No. H033718. Sixth Dist. Dec. 20, 2010.]

JACOBS FARM/DEL CABO, INC., Plaintiff and Respondent, v.
WESTERN FARM SERVICE, INC., Defendant and Appellant.

1508

COUNSEL

Morris Polich & Purdy, Richard H. Nakamura, Jr.; Petrie, Dorfmeier & Morris, Dale Dorfmeier; Barnes & Thornburg and Dean T. Barnhard for Defendant and Appellant.

California Farm Bureau Federation, Kari E. Fisher; Kahn, Soares & Conway and Ann M. Grottveit for Air Coalition Team as Amicus Curiae on behalf of Defendant and Appellant.

Comstock, Thompson, Kontz & Brenner, Austin B. Comstock; Law Offices of Joel Franklin and Joel Franklin for Plaintiff and Respondent.

Natural Resources Defense Council, Inc., Avinash Kar, Jason Malinsky; Center on Race, Poverty & the Environment and Alegria De La Cruz as Amici Curiae on behalf of Plaintiff and Respondent.

---

OPINION

**PREMO, J.**—Plaintiff Jacobs Farm/Del Cabo, Inc., sued defendant Western Farm Service, Inc., alleging that pesticides defendant applied to fields near plaintiff's farm migrated to plaintiff's land, contaminated plaintiff's crop, and rendered the crop unmarketable. Plaintiff sued defendant for crop losses it suffered in 2006 and for an injunction to prevent further pesticide applications in 2007. By the time of trial in 2008, the injunction issue was moot; both the 2006 and the 2007 crops had been contaminated by the migrating pesticide. A jury found defendant liable in negligence, trespass, and nuisance and awarded plaintiff $1 million for the 2007 loss but nothing for 2006.

On appeal, defendant raises several arguments relating to the overall viability of plaintiff's claims in light of the comprehensive statutory scheme governing the use of pesticides in California. (Food & Agr. Code, § 11401 et seq.; Cal. Code Regs., tit. 3, § 6000 et seq.; collectively, the pesticide laws.)[1] Defendant argues that the superior court lacked jurisdiction, except as allowed by the pesticide laws, to issue an injunction controlling the place where pesticides may be applied. Because that issue is not properly before us, we do not reach it. Defendant also raises several challenges to plaintiff's

---

[1] Further undesignated section references are to the Food and Agricultural Code. Further references to "title 3" are to title 3 of the California Code of Regulations.

common law claims for damages. We reject these on their merits. We hold that plaintiff's causes of action for negligence, trespass, and nuisance are not displaced by the pesticide laws; the statutory scheme leaves ample room for such claims. We also find that the negligence and trespass causes of action were not barred by an administrative determination that defendant had complied with the pesticide laws, that the trial court did not err by instructing the jury in the doctrine of negligence per se, and that Civil Code section 3482 does not bar the nuisance cause of action. Accordingly, we shall affirm.

## I. BACKGROUND

Plaintiff is a farming company that leases approximately 120 acres in Wilder Ranch State Park (Wilder Ranch) where it grows organic crops, including culinary herbs such as rosemary, dill, and cilantro. Defendant is a dealer in agricultural chemicals that advises farmers on the use of pesticides, recommends and sells products for control of pests, and also provides pesticide application services.

Plaintiff's Wilder Ranch fields are surrounded on three sides by other farms and on the south by the Pacific Ocean. The entire area, including the Wilder Ranch property, had been farmed conventionally and planted in Brussels sprouts for most of the past 50 years or more. Plaintiff began its organic farming enterprise at Wilder Ranch in 1998 and was certified as an organic farm under the National Organic Program in 2000. By 2006, when the incidents giving rise to this suit first arose, two of the surrounding farms were still planted in conventionally grown Brussels sprouts.

During the 2006 growing season, defendant recommended and applied certain organophosphate pesticides[2] to the Brussels sprouts fields adjacent to Wilder Ranch. These pesticides are important to the Brussels sprouts industry, having been used successfully for over 30 years to kill or retard the proliferation of pests that could otherwise destroy the growing crop. Defendant applied the pesticides pursuant to permits issued by the Santa Cruz County Agricultural Commissioner (commissioner). Defendant made the applications in a manner that would prevent the pesticide from drifting to nontarget crops during the application process. Nevertheless, some time after it was applied, some of the pesticide dispersed into the air (volatilized) and moved with the fog or the wind over plaintiff's fields. This was a problem because herbs like rosemary and dill are particularly susceptible to picking up the volatilized chemical. It was also a

---

[2] The particular chemicals used were chlorpyrifos, diazinon, and dimethoate, among others.

problem because the federal Environmental Protection Agency (EPA) sets no maximum tolerance level for organophosphate pesticide residue on those herbs. Herbs with any detectable amount of the pesticides cannot be sold—either as organic or conventional—period. Thus, when the pesticide volatilized and moved over plaintiff's farm, the herbs picked up the airborne chemicals and the crop was ruined.

Plaintiff first discovered the pesticide residue in October 2006, when one of plaintiff's wholesale customers alerted plaintiff to the results of tests it conducted on herbs grown at Wilder Ranch. Plaintiff reported the finding to the commissioner and filed a crop-loss report in November 2006. Plaintiff conducted its own investigation into the source of the contamination and, as part of that investigation, obtained a list from the commissioner's office, setting forth the names and pesticide permit numbers of all growers within a five-mile radius of plaintiff's fields. Plaintiff determined that defendant had applied the pesticides on the fields closest to Wilder Ranch and, in February 2007, plaintiff's attorney informed defendant that plaintiff held it responsible for the contamination.

The deputy commissioner, Lisa LeCoump, conducted the commissioner's investigation to determine if the pesticide residue on the herbs was caused by a violation of the pesticide laws. In particular, the deputy commissioner's investigation focused upon whether defendant had violated title 3, section 6614, which provides, among other things, that "[n]otwithstanding that substantial drift will be prevented," a pesticide applicator must defer or cease a pesticide application if there is a "reasonable possibility of damage" to nontarget crops. (Tit. 3, § 6614, subd. (b)(2).) In her report dated March 5, 2007, the deputy commissioner noted that defendant's responsibility under the regulation was to avoid drift, which she interpreted to mean the movement of the pesticide away from the target crops at or around the time the pesticide is applied. The commissioner did not hold the pesticide applicator responsible for movement of the pesticide after the application, "such as by translocation, volatilization, evaporation or other forms of 'lift off.' " Applying that interpretation of the regulation, the deputy commissioner found no evidence that defendant had violated title 3, section 6614. The commissioner did not add any conditions to defendant's pesticide application permits for the 2007 growing season.

Plaintiff did not pursue to finality any administrative challenge to the deputy commissioner's conclusion that defendant had not violated the law nor to the commissioner's failure to add conditions to its permits for the 2007 growing season. According to plaintiff's founder, Laurence Jacobs, the commissioner's office had told him there was nothing it could do about postapplication drift.

In April 2007, plaintiff's rosemary crop showed low but detectable levels of pesticide, prompting plaintiff to file a complaint in the superior court on May 8, 2007. The complaint alleged causes of action for negligence, trespass, and nuisance and prayed for damages and an injunction. Plaintiff sued only defendant. Plaintiff did not sue the commissioner or the farm operators who had hired defendant to spray their fields. The complaint alleged that defendant was responsible for contaminating plaintiff's crop in 2006 and, that "Plaintiff fears that unless Defendant is enjoined from causing hazardous pesticides to appear in Wilder Ranch Farm organic crop fields, Plaintiff will suffer irreparable harm to the crops planted for harvest in 2007 and to soils in which the crops are being grown." The local newspaper published a letter from Jacobs on or about June 10, 2007, in which he complained that under current law he could not stop the pesticide spraying that damaged his crop and that he had undertaken this lawsuit to change the law.

The trial court issued a temporary restraining order as plaintiff had requested, but dissolved the order in June 2007 and denied plaintiff's request for a preliminary injunction. The court noted that the deputy commissioner had found no violation of the pesticide laws and, as it happened, crop samples taken in May showed no detectable pesticide on the herbs.

During the spring of 2007, defendant had voluntarily decided to use different types of pesticides to control pests in the Brussels sprouts fields and had advised plaintiff's personnel whenever it planned to spray. But by July of that year, the pest population had increased to the point that defendant decided to return to the use of organophosphates, this time trying a product other than the one it had used in 2006, adding drift retardant, and taking other precautions in an attempt to prevent postapplication drift. Plaintiff continued testing its crop for the presence of organophosphate pesticide. Tests in July, August, and September 2007 came back positive for pesticide residue. Plaintiff filed another crop-loss report. The deputy commissioner performed a second investigation and again found no violation of the pesticide laws.

On September 25, 2007, plaintiff and defendant stipulated to a preliminary injunction by which defendant agreed not to apply the subject pesticides on two fields closest to plaintiff's fields, leaving a 1.5-mile buffer zone surrounding plaintiff's crop. In April 2008, the commissioner placed a condition upon defendant's pesticide application permits, requiring a half-mile buffer zone between the sprayed areas and plaintiff's fields.

## II. Trial of Plaintiff's Complaint for Damages

Trial commenced in September 2008. Given the now-mandatory half-mile buffer zone, trial focused solely upon plaintiff's claims for damages. Plaintiff's experts testified that the volatilization phenomenon has been known to

scientists for years. In areas where there is frequent coastal fog, such as Wilder Ranch, volatilization is common. The experts concluded that the organophosphate residue on plaintiff's crop had been deposited there by the volatilization process and that the source of the residue was the pesticides that defendant applied to one or another of the fields near plaintiff's farm.

Although scientists may have known about volatilization, none of the individuals involved in this case had actually known about it prior to the discovery of the residue on plaintiff's crop in October 2006. Jacobs did not know about volatilization until he began looking into why his crop turned up with the pesticide in 2006. William Rodoni, a third-generation Brussels sprouts farmer whose fields were adjacent to plaintiff's, was surprised to learn that the pesticides could move off the target site. The deputy commissioner had assumed that once the pesticides were sprayed, they "pretty much stayed on the crop where they were sprayed." It was in the course of investigating plaintiff's crop-loss report that she first learned of a study from the 1980's showing pesticide contamination of a dill crop at Wilder Ranch caused by volatilized pesticide.

Plaintiff argued that defendant should have been aware of the possibility of volatilization and had been negligent in failing to keep abreast of the scientific literature. A good portion of plaintiff's case was an attack upon the deputy commissioner's interpretation of title 3, section 6614. As plaintiff interpreted the regulation, a pesticide applicator must defer or cease a pesticide application if there is a reasonable possibility of damage to nontarget crops regardless of when that damage might take place. This was different than the deputy commissioner's understanding, which was that a pesticide applicator is not responsible for that which occurs after the pesticide is applied.

The deputy commissioner maintained her position at trial. Plaintiff's counsel asked, "Now, I don't think there's any confusion that to allow spray drift to leave a target site and injure another person's crop is against the laws and regulations, is it not?" The deputy commissioner replied, "Yes. But the definition of 'drift' is the movement during the application, so if it left after the application it's not under our jurisdiction." The deputy commissioner later conceded that her answer, that the commissioner's office does not have jurisdiction over postapplication drift, may not have been correct. Indeed, she acknowledged that the commissioner had imposed the buffer-zone condition upon defendant's permits for 2008 to help prevent postapplication drift. Nevertheless, she insisted "it's not a violation [of the regulation] if the material is moving offsite after the application. It's not considered drift, so it's not a violation of the drift regulation."

Defendant's theory was that it had followed the law, complied with the requirements of its permits, applied the pesticides with due care, and was not responsible for what happened after it finished the job. Douglas Okumura, a recently retired assistant director of the Department of Pesticide Regulation (DPR), supported the deputy commissioner's view of title 3, section 6614. He stated that the DPR holds a pesticide applicator responsible for drift before and during an application but not for movement that happens later. Defendant also argued that plaintiff was contributorily negligent in choosing to plant a vulnerable crop in an area surrounded by conventional Brussels sprouts farms and in failing to establish its own buffer zone between its crop and the neighboring fields.

In his argument to the jury, plaintiff's counsel urged the jury to read and consider the letter Jacobs had published in the local newspaper, pointing out that plaintiff had filed this case specifically to change the law. And, after summarizing the deputy commissioner's testimony that postapplication drift was not a violation of title 3, section 6614, plaintiff's counsel told the jury: "This is your time to construe that section using the language in the regulation and apply it accordingly. Because if it isn't in your jurisdiction, then this is a meaningless regulation. Somebody has to enforce that regulation. Here's the time and place to do that."

The trial court instructed the jury in the common law of negligence, trespass and nuisance, and also in the doctrine of negligence per se. With respect to negligence per se, the court instructed the jury in the language of title 3, section 6614, and told the jury, "If you decide that [defendant] violated this law and that the violation was a substantial factor in bringing about the harm, then you must find that [defendant] was negligent unless you also find that the violation was excused." Defendant would be excused from a violation if defendant "was not able to obey the law" or if defendant "reasonably believed, from prior representations from the [DPR] or the Santa Cruz County Agricultural commissioner, that the law did not apply to other than spray drift at the time of application and it was complying with the law."

The jury found, by a vote of nine to three, that defendant was negligent, had trespassed, had created a nuisance, and that its conduct was a substantial factor in causing harm to plaintiff. These findings did not specify whether the torts had been committed in 2006, 2007, or both, but the damages award was broken down by year. The jury awarded plaintiff zero for its 2006 crop loss and $1 million for the 2007 crop loss. Although the jury also found that plaintiff was contributorily negligent, it concluded that plaintiff's negligence was not a substantial factor in causing the harm. The trial court denied defendant's motions for new trial and judgment notwithstanding the verdict.

Plaintiff dismissed its prayer for injunctive relief. Judgment was entered on the jury verdict. The trial court awarded attorney fees to plaintiff. Defendant has timely appealed.

## III. CONTENTIONS

The gist of defendant's contentions on appeal is that the statutory scheme governing pesticide use in California displaces common law claims to the extent such claims would have the effect of regulating the place where pesticides may be applied. The argument has two prongs. First, defendant maintains that the superior court has no jurisdiction to issue an injunction relating to pesticide use except as specifically permitted by the pesticide laws. Second, defendant argues that common law claims for damages are also displaced to the extent the claims relate only to the place where the pesticides were applied. Subsidiary arguments are that the deputy commissioner's finding of no violation should have been given collateral estoppel effect and that the trial court erred in instructing the jury in the doctrine of negligence per se. Defendant also argues that Civil Code section 3482, which states that conduct authorized by law is not a nuisance, barred plaintiff's nuisance cause of action.[3] Defendant's final argument, which we need not reach, is that reversal of the judgment requires reversal of the attorney fees award.

We begin our discussion with a brief summary of the statutory and regulatory scheme.

## IV. DISCUSSION

### A. The Statutory Scheme

█ It is an understatement to say that the use of pesticides in California is highly regulated. Federal and state laws govern every aspect of pesticide use, from testing, approval, and labeling of pesticides to licensing pesticide applicators and investigating complaints of pesticide-related injuries. (See 7 U.S.C. § 136 et seq.; *Etcheverry v. Tri-Ag Service, Inc.* (2000) 22 Cal.4th 316, 321 [93 Cal.Rptr.2d 36, 993 P.2d 366], overruled on another ground in *Bates v. Dow Agrosciences LLC* (2005) 544 U.S. 431, 436–437 [161 L.Ed.2d 687, 125 S.Ct. 1788].) California law overlays a comprehensive federal scheme with its own extensive system of statutes and regulations administered by the DPR. (*Californians for Alternatives to Toxics v. Department of Food & Agriculture* (2005) 136 Cal.App.4th 1, 13 [38 Cal.Rptr.3d 638].)

---

[3] We have received and considered briefs from amici curiae California Farm Bureau Federation and Air Coalition Team on behalf of defendant and the National Resources Defense Council and Center on Race, Poverty, and the Environment on behalf of plaintiff.

County agricultural commissioners are local appointees licensed by the director of the DPR (director). (§§ 2101, 2121.) Commissioners have broad authority over local enforcement of the pesticide laws, subject to oversight by the director. (§ 2281.)

The code sections relevant to this case are found in divisions 6 and 7 of the Food and Agricultural Code. The express purposes of the relevant provisions of divisions 6 and 7 include providing for the "safe, and efficient use of pesticides essential for production of food," protecting the environment, pesticide workers, and public health, and encouraging the development of pest management systems that "achieve acceptable levels of control with the least possible harm to nontarget organisms and the environment." (§ 11501, subds. (a), (f).)[4] Division 6 governs the persons operating pest control businesses. (§ 11401 et seq.) It requires, among other things, that all pest control operators be licensed by the director (§ 11701) and registered with the commissioners in all counties in which they operate (§ 11732).

■ Division 7 regulates the use of pesticides. (§ 12500 et seq.) Of particular interest to us is article 1 of chapter 3 of division 7, pertaining to "restricted materials," which includes the organophosphate pesticides at issue in this case. (§ 14004.5; tit. 3, § 6400; 7 U.S.C. §§ 136, 136a.) Under the provisions of this article, no person may apply agricultural pesticides classified as restricted without first obtaining a permit from the commissioner in the county where the materials are to be applied. Every permit issued "shall include conditions for use in writing." (§ 14006.5.) The permits are site specific and are generally issued on a yearly basis. (§ 14007; tit. 3, § 6422.) Within 24 hours of any planned application, the farm operator or the pesticide

---

[4] Section 11501 provides in full: "The purposes of this division and Chapter 1 (commencing with Section 12501), Chapter 2 (commencing with Section 12751), Chapter 3 (commencing with Section 14001), and Chapter 3.5 (commencing with Section 14101) of Division 7 are as follows:

"(a) To provide for the proper, safe, and efficient use of pesticides essential for production of food and fiber and for protection of the public health and safety.

"(b) To protect the environment from environmentally harmful pesticides by prohibiting, regulating, or ensuring proper stewardship of those pesticides.

"(c) To assure the agricultural and pest control workers of safe working conditions where pesticides are present.

"(d) To permit agricultural pest control by competent and responsible licensees and permittees under strict control of the director and commissioners.

"(e) To assure consumers and users that pesticides are properly labeled and are appropriate for the use designated by the label and that state or local governmental dissemination of information on pesticidal uses of any registered pesticide product is consistent with the uses for which the product is registered.

"(f) To encourage the development and implementation of pest management systems, stressing application of biological and cultural pest control techniques with selective pesticides when necessary to achieve acceptable levels of control with the least possible harm to nontarget organisms and the environment."

applicator must file a notice of intent with the commissioner. (Tit. 3, § 6434.) The notice of intent apprises the commissioner of the time and place of the intended applications, the product and dilution that will be used, and the identity of any sensitive areas, such as waterways, schools, livestock, and crops that "changed since the permit was issued and which may be adversely impacted" by the planned application so that the commissioner may decide whether further conditions or limitations should be imposed. (Tit. 3, § 6434, subd. (b)(11); see tit. 3, § 6428, subd. (c).)

██ Notwithstanding its permit requirements, article 1 of chapter 3 of division 7, "does not relieve any person from liability for any damage to the person or property of another person which is caused by the use of any restricted material." (§ 14003.) Moreover, the Legislature has tempered the commissioner's permitting authority with section 14009. Under section 14009, subdivision (a), "Any interested person" may ask the commissioner to review a decision pertaining to the issuance, refusal to issue, revocation, or suspension of a permit. "A directly affected person may thereafter appeal to the director to review the commissioner's action." (*Ibid.*) The commissioner and the director must act on a request for review or appeal within 10 days (*id.*, subds. (a) & (e)) and both are directed to conduct their reviews, "in an expeditious manner so that needed pest control measures are not adversely affected" (*id.*, subd. (b)). Judicial review of any decision by the director under section 14009 may be had via a petition for writ of administrative mandamus. (*Id.*, subd. (g); Code Civ. Proc., § 1094.5.)

At the heart of this case is title 3, section 6614. Title 3, section 6614, provides, in pertinent part, "(a) An applicator prior to and while applying a pesticide shall evaluate the equipment to be used, meteorological conditions, the property to be treated and surrounding properties to determine the likelihood of harm or damage. [¶] (b) Notwithstanding that substantial drift will be prevented, no pesticide application shall be made or continued when: [¶] . . . [¶] (2) There is a reasonable possibility of damage to nontarget crops . . . ." (Tit. 3, § 6614, subds. (a), (b)(2).)[5] " 'Substantial Drift' means [that] the quantity of pesticide outside of the area treated is greater than that

---

[5] Title 3, section 6614 provides in full: "(a) An applicator prior to and while applying a pesticide shall evaluate the equipment to be used, meteorological conditions, the property to be treated and surrounding properties to determine the likelihood of harm or damage.

"(b) Notwithstanding that substantial drift will be prevented, no pesticide application shall be made or continued when:

"(1) There is a reasonable possibility of contamination of the bodies or clothing of persons not involved in the application process;

"(2) There is a reasonable possibility of damage to nontarget crops, animals or other public or private property; or

"(3) There is a reasonable possibility of contamination of nontarget public or private property, including the creation of a health hazard, preventing normal use of such property. In

which would have resulted had the applicator used due care." (Tit. 3, § 6000.) In general, "The use of any pesticide by any person shall be in such a manner as to prevent substantial drift to nontarget areas." (§ 12972.)

■ Violation of any provision of either division 6 or 7 or any associated regulation is a misdemeanor subject to fines and imprisonment or civil penalties. (§§ 11891–11895, 12996–12999.) Any money recovered is paid to the DPR. (§ 12998.) The director or a commissioner may also seek an injunction to restrain the violation of any order made pursuant to division 6 or 7. (§§ 11895.5, 13000.1.) Section 12999.2 specifies, "The remedies or penalties provided by [division 7] are in addition to the remedies or penalties available under any other law." Neither division authorizes monetary compensation for property damage caused by violation of the pesticide laws.

Finally, section 11501.1, subdivision (a) provides that divisions 6 and 7 "are of statewide concern and occupy the whole field of regulation regarding the registration, sale, transportation, or use of pesticides to the exclusion of all local regulation. Except as otherwise specifically provided in this code, no ordinance or regulation of local government, including, but not limited to, an action by a local governmental agency or department, a county board of supervisors or a city council, or a local regulation adopted by the use of an initiative measure, may prohibit or in any way attempt to regulate any matter relating to the registration, sale, transportation, or use of pesticides, and any of these ordinances, laws, or regulations are void and of no force or effect."

## B. Injunctive Relief

■ Defendant's first argument is that the superior court has no jurisdiction to entertain a private suit for injunctive relief pertaining to the use of regulated pesticides. Defendant recognizes that the issue is moot but asks us to decide the issue due to its statewide importance. Plaintiff takes the opposite view. Plaintiff's view is the correct one. The general rule is, "Courts do not decide abstract questions of law. An indispensable element to jurisdiction is that there be an actual controversy between parties who have an adversarial interest in the outcome of the litigation." (*Connerly v. Schwarzenegger* (2007) 146 Cal.App.4th 739, 746 [53 Cal.Rptr.3d 203].) Thus, courts typically do not decide moot questions since such decisions "can have no practical effect or cannot provide the parties with effective relief." (*Californians for Alternatives to Toxics v. Department of Pesticide Regulation* (2006) 136 Cal.App.4th 1049, 1069 [39 Cal.Rptr.3d 393].)

■ In this case, the question of the court's power to issue an injunction is moot because there is no injunction; plaintiff dismissed its prayer for

determining a health hazard, the amount and toxicity of the pesticide, the type and uses of the property and related factors shall be considered."

injunctive relief following the verdict. Furthermore, defendant waived objection to the preliminary injunction by expressly stipulating to it. More crucially, an order granting a preliminary injunction is immediately and separately appealable. (*County of San Diego v. State of California* (1997) 15 Cal.4th 68, 110 [61 Cal.Rptr.2d 134, 931 P.2d 312]; Code Civ. Proc., § 904.1, subd. (a)(6).) Any attempt to challenge such an order in an appeal filed after entry of final judgment is untimely. (*County of San Diego v. State of California, supra,* at p. 110.) For all these reasons, the question whether, in a private civil suit, the superior court may issue an injunction controlling the place where pesticides may be applied, is a question we must leave for another day.

Although the issue is not squarely before us, we do question whether the process plaintiff employed in attempting to protect its 2007 crop was the process the Legislature had contemplated. The deputy commissioner found that defendant had not violated the law in 2006 and defendant's permits for the 2007 growing season apparently allowed the use of the same pesticides in the same places they were allowed in 2006.[6] Plaintiff could have challenged the permits by way of the streamlined review process outlined in section 14009. Plaintiff had been given the names of all the surrounding growers and the permit numbers under which their pesticide applications were authorized and, therefore, could easily have found out what was going to be sprayed on the fields nearby and what conditions the commissioner had imposed. But as far as we can tell from the record, plaintiff did not object to the permit conditions as section 14009 allows. Plaintiff was understandably frustrated, trying to prevent further contamination of its herb crop, while defendant, which had been cleared of any prior unlawful conduct and had the commissioner's explicit authorization to make the same applications in 2007, was stuck with the Hobson's choice of making those applications and risking further damage to plaintiff's crop, or not spraying at all and risking injury to its clients' product. An expedited review by the commissioner and the DPR under section 14009, followed, if necessary, by judicial review pursuant to Code of Civil Procedure section 1094.5, might have resolved the matter more promptly than it was. In any event, that was all water under the bridge by the time of trial.

### C. Common Law Claims for Damages

#### 1. Scope and Standard of Review

Defendant's remaining arguments concern the scope of the statutory scheme and its effect upon the common law claims alleged. Defendant

---

[6] The permits themselves do not appear in the record.

maintains, for various reasons, that the pesticide laws bar plaintiff's common law claims because the claims were all based upon the *place* where the pesticide was applied. As we understand it, defendant's position is that only the administrative agencies charged with enforcing the pesticide laws may decide the place of application. Plaintiff maintains that the pesticide laws left all common law causes of action intact so that its complaint is not affected by the statutory scheme at all.

■ Although the parties describe their arguments in the language of preemption, the preemption doctrine is not strictly applicable to the questions presented, although the analysis is similar. Preemption applies where federal law supersedes state law or state law supersedes local law. (*Zengen, Inc. v. Comerica Bank* (2007) 41 Cal.4th 239, 247, fn. 5 [59 Cal.Rptr.3d 240, 158 P.3d 800] (*Zengen*).) Under the preemption doctrine, the lower jurisdiction cannot act in the area covered by the preemptive law. ■ In the present case there is no question that the pesticide laws preempt local regulation; section 11501.1 expressly prohibits all local ordinances on the subject. This case does not involve the preemption doctrine because it concerns allegedly conflicting provisions of coequal state laws—state statutes and state common law. ■ As one court said, "common law is only one of the forms of law and is no more sacred than any other. . . . [I]t may be changed at the will of the [L]egislature, unless prevented by constitutional limitations." (*People v. Hickman* (1928) 204 Cal. 470, 479 [270 P. 1117].) Thus, the question presented is better articulated as whether the enactment of the pesticide laws displaced the common law that previously governed the subject in dispute. (*Zengen, supra,* at p. 247, fn. 5.)

The rule is that statutes do not displace the common law " 'unless it appears that the Legislature intended to cover the entire subject or, in other words, to "occupy the field." ' (*I. E. Associates v. Safeco Title Ins. Co.* (1985) 39 Cal.3d 281, 285 [216 Cal.Rptr. 438, 702 P.2d 596].)" (*K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.* (2009) 171 Cal.App.4th 939, 953 [90 Cal.Rptr.3d 247].) Thus, our task is to decide whether, by enacting the pesticide laws, the Legislature has fully occupied the field and displaced the common law rules that plaintiff sought to apply here. (Cf. *Zengen, supra,* 41 Cal.4th at p. 251.) Because the questions before us call for interpretation of statutory and regulatory provisions, they are purely legal questions to which we apply the independent standard of review. (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672].) That review is guided by settled rules, all of which are geared to ascertaining the intent of the lawmakers and avoiding an interpretation that would lead to absurd consequences. (*Cypress Semiconductor Corp. v. Superior Court* (2008) 163 Cal.App.4th 575, 581 [77 Cal.Rptr.3d 685].)

■ One obvious legislative aim, made clear by the passage of section 11501.1, is that pesticide use be regulated on a statewide basis. Regulating the subject at the state level gives growers and others in the agricultural industry some measure of predictability when choosing to use, or not to use, pesticides. The scientific expertise and judgment involved in regulating the use of these economically important, highly toxic materials cannot be over-estimated. Limiting regulation to the state level ensures that standards will be uniform statewide. (Cf. *City of Watsonville v. State Dept. of Health Services* (2005) 133 Cal.App.4th 875, 887–888 [35 Cal.Rptr.3d 216].) Local decisions regulating pesticide use, varying from county to county, can be justified only if applied within the context of the overall regulatory scheme. (Cf. *Paredes v. County of Fresno* (1988) 203 Cal.App.3d 1, 10 [249 Cal.Rptr. 593].) When private litigation threatens to interfere with the Legislature's clearly expressed policies, it is precluded. If it were not, the potential for conflict between the Legislature's balance of the various competing interests and those asserted by individuals in a private dispute would generate an intolerable amount of uncertainty for the litigants and for the agricultural industry as a whole. Our overriding concern, therefore, is with the potential that plaintiff's claims could interfere with the Legislature's express intent to ensure statewide regulation of pesticide use.

## 2. *The Pesticide Laws Do Not Displace All Common Law Tort Claims*

By the time of trial, the deputy commissioner had found that both the 2006 and the 2007 applications were legal and the main thrust of the defense was that defendant had complied with its permit conditions, that it had done what other pesticide applicators would have done in the same situation, and that the deputy commissioner's findings showed that defendant had not breached any duty of care to plaintiff. In short, the case went forward as a simple tort case seeking only monetary damages.

■ Although the scope of the statutory and regulatory scheme is broad, it provides no means of compensation for crop losses resulting from pesticide use. Section 14003 specifies that the article requiring permits for restricted use pesticides "does not relieve any person from liability for any damage to the person or property of another person which is caused by the use of any restricted material." Since the law makes no provision for a damages remedy, section 14003 implies that injured persons retain the right to sue for damages under the common law. And section 12999.2 expressly confirms that the "remedies or penalties" provided by division 7 are "in addition to the remedies or penalties available under any other law." Given these savings clauses, it is reasonable to conclude that the Legislature intended, as a general matter, to allow for common law claims seeking damages. Defendant does not contend otherwise.

### 3. The Exhaustion Doctrines Do Not Apply

Defendant's challenge to plaintiff's damage claims rests in large part upon the fact that the deputy commissioner found defendant had not violated title 3, section 6614. Whether or not the deputy commissioner's interpretation of that section was correct, the fact was that her finding of no violation in 2006 was not submitted to any administrative challenge and was a final decision on the merits of the issue she decided. She reached the same conclusion on her review of the 2007 pesticide applications. Defendant argues that these findings should have been given collateral estoppel effect. Amici curiae, California Farm Bureau Federation and Air Coalition Team, maintain that the suit should have been dismissed at the outset because plaintiff failed to exhaust administrative remedies challenging the deputy commissioner's no-violation finding. Neither defense was litigated below. In any event, we reject the arguments.

The exhaustion of administrative remedies doctrine is this: "[W]here an administrative remedy is provided by statute, relief must be sought from the administrative body and this remedy exhausted before the courts will act." (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 292 [109 P.2d 942].) The doctrine typically applies only to *statutory* claims. (*Rojo v. Kliger* (1990) 52 Cal.3d 65, 84 [276 Cal.Rptr. 130, 801 P.2d 373].) Plaintiff's claims for damages are not statutory. Furthermore, as we shall shortly explain, plaintiff had no administrative remedy for challenging the deputy commissioner's finding that defendant had not violated the law.

Defendant's collateral estoppel argument invokes the *judicial* exhaustion doctrine, which may arise when a party initiates and takes to decision an administrative process, "whether or not the party was required, as a matter of *administrative* exhaustion, to even begin the administrative process in the first place." (*McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 113 [84 Cal.Rptr.3d 734, 194 P.3d 1026].) "Once a decision has been issued, provided that decision is of a sufficiently judicial character to support collateral estoppel, respect for the administrative decisionmaking process requires that the prospective plaintiff continue that process to completion, including exhausting any available judicial avenues for reversal of adverse findings. [Citation.] Failure to do so will result in any quasi-judicial administrative findings achieving binding, preclusive effect and may bar further relief on the same claims." (*Ibid.*) The doctrine also may apply where a plaintiff had the opportunity to fully litigate his claims in a quasi-judicial administrative hearing but failed to do so. (*Murray v. Alaska Airlines, Inc.* (2010) 50 Cal.4th 860 [114 Cal.Rptr.3d 241, 237 P.3d 565].) In such cases, the factual matter decided by the administrative agency has a binding, preclusive effect in subsequent litigation on the same issue when asserted

against a party who was a party to the prior proceeding. (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341 [272 Cal.Rptr. 767, 795 P.2d 1223].)

As should be clear from the foregoing, the judicial exhaustion doctrine does not apply here for at least two reasons. First, the decision does not have the judicial character needed for collateral estoppel to apply. The deputy commissioner conducted an investigation. The investigation was not a quasi-judicial process nor did the statutory scheme provide any fair hearing procedure for plaintiff to challenge the deputy commissioner's finding. Citing *Patterson Flying Service v. Department of Pesticide Regulation* (2008) 161 Cal.App.4th 411, 419 [74 Cal.Rptr.3d 290], defendant argues that there were multiple layers of administrative review available for plaintiff to challenge the deputy commissioner's factual and legal conclusion and that the review process is governed by the Administrative Procedure Act (Gov. Code, §§ 11400 et seq., 11500 et seq.), which gives it the necessary judicial character. Our review of the statutory scheme does not disclose any avenue for plaintiff to have directly challenged the deputy commissioner's findings. A "person charged" with violating the pesticide laws must be given notice and a hearing (§ 12999.4, subd. (b)), which is how the issue came up in *Patterson Flying Service.* (*Patterson Flying Service, supra*, at p. 417.) The statutes also provide that "[a]ny person aggrieved" by a commissioner's cease and desist order may appeal to the director. (§ 13102.) Here, plaintiff was neither charged with a violation nor aggrieved by a cease and desist order. Indeed, plaintiff was not, strictly speaking, a party to the deputy commissioner's investigation. By analogy to an alleged Penal Code violation, plaintiff would be the victim. The deputy commissioner's investigation was focused upon determining whether the harm plaintiff suffered was the result of defendant's unlawful act such that defendant should be subject to fines or other sanctions. But the deputy commissioner's conclusion had no direct effect upon plaintiff and plaintiff had no specific administrative process for directly challenging it.

The collateral estoppel doctrine does not apply for the additional reason that the deputy commissioner's conclusion—that defendant had not violated title 3, section 6614—was not dispositive of any material fact necessary to prove plaintiff's common law causes of action. As to the negligence cause of action, it is elementary that in order to establish liability, a plaintiff must prove that the defendant breached a duty of care that was the proximate cause of injury to the plaintiff. (*Artiglio v. Corning Inc.* (1998) 18 Cal.4th 604, 614 [76 Cal.Rptr.2d 479, 957 P.2d 1313]; 6 Witkin, Summary of Cal. Law (10th ed. 2005) Torts, § 835, p. 52.) In most cases, the standard of care for tort liability is that of "a reasonably prudent person under like circumstances." (*Ramirez v. Plough, Inc.* (1993) 6 Cal.4th 539, 546 [25 Cal.Rptr.2d 97, 863 P.2d 167].) Compliance with the law does not necessarily prove that the defendant met that standard of care. Typically, compliance with

the law "simply constitutes evidence for jury consideration with other facts and circumstances." (*Hernandez v. Badger Construction Equipment Co.* (1994) 28 Cal.App.4th 1791, 1830–1831 [34 Cal.Rptr.2d 732].) The reason for that is that statutes and regulations "cannot take into account the particular concerns of individual cases. They aim at minimum standards but are not meant to establish the outer limits of the defendant's safety responsibilities." (1 Dobbs, The Law of Torts (2001) § 224, p. 573.) Thus, the deputy commissioner's finding that defendant had complied with the law, even if final and on the merits, did not negate any element essential to the proof of plaintiff's negligence claim. Since the trespass cause of action depended upon a finding of negligent entry, the deputy commissioner's finding did not affect it, either.[7]

Almost 60 years ago, the Attorney General issued an opinion with which we agree today. The opinion was rendered in response to questions about the effect of the then newly enacted provisions requiring a permit for the application of potentially injurious agricultural chemicals. Responding to concern that compliance with permit requirements might relieve pesticide applicators from liability for negligent acts, the Attorney General opined: "Nowhere does it state that if one has secured the necessary permit and has observed all the established rules and regulations, he should be held blameless for his negligent act. The rules and regulations as established from time to time will undoubtedly indicate the manner in which an individual who desires to be free of negligence should operate. The mere fact, however, that he follows the rules and regulations does not in itself guarantee that he is free of negligence. And nowhere is he relieved of responsibility for his negligent acts." (18 Ops.Cal.Atty.Gen. 221, 223 (1951).)

In sum, to the extent defendant argues that the deputy commissioner's decision should have had some preclusive effect upon plaintiff's claims for damages, we reject it. In this regard, the statutory scheme and the common law are complementary, not conflicting. Plaintiff's lawsuit had no effect upon the commissioner's ability to regulate pesticide use or upon the validity of the deputy commissioner's conclusion as it pertained to defendant's liability under the pesticide laws. Similarly, the deputy commissioner's determination that defendant had complied with the law did not bar plaintiff from pursuing defendant for damages arising from its alleged lack of due care.

### 4. Negligence Per Se

Defendant also argues that the trial court erred by instructing the jury in the doctrine of negligence per se. Plaintiff's briefs do not address the argument. Nevertheless, we reject it.

---

[7] We discuss the nuisance cause in further detail below.

 Although compliance with the law does not prove the absence of negligence, violation of the law does raise a presumption that the violator was negligent. This is called negligence per se. The presumption of negligence arises if (1) the defendant violated a statute; (2) the violation proximately caused the plaintiff's injury; (3) the injury resulted from the kind of occurrence the statute was designed to prevent; and (4) the plaintiff was one of the class of persons the statute was intended to protect. (*Quiroz v. Seventh Ave. Center* (2006) 140 Cal.App.4th 1256, 1284–1285 [45 Cal.Rptr.3d 222] (*Quiroz*), citing Evid. Code, § 669, subd. (a).) The first two elements are normally questions for the trier of fact and the last two are determined by the trial court as a matter of law. (*Quiroz, supra,* at p. 1285.) That is, the trial court decides whether a statute or regulation defines the standard of care in a particular case.

Here, the crux of the dispute was whether title 3, section 6614 was intended to prevent the possibility of damage caused by postapplication drift. Although plaintiff's attorney told the jury that it was being asked to decide this question, the trial court had effectively decided it before the jury got the case. As our Supreme Court has explained, "The significance of the statute in a civil suit for negligence lies in its formulation of a standard of conduct that *the court* adopts in the determination of such liability. [Citations.] The decision as to what the civil standard should be still rests with the court, and the standard formulated by a legislative body in a police regulation or criminal statute becomes the standard to determine civil liability only because *the court* accepts it." (*Clinkscales v. Carver* (1943) 22 Cal.2d 72, 75 [136 P.2d 777], italics added.) Thus, notwithstanding counsel's argument, when the trial court instructed the jury in the language of title 3, section 6614 and the negligence per se doctrine, the court had implicitly determined, as a matter of law, that the regulation was intended to prevent harm caused by postapplication drift.

Defendant maintains that the negligence per se instruction was error because it allowed the jury to second-guess the deputy commissioner. Given the trial court's implicit finding—that title 3, section 6614 applies to postapplication drift—the error of which defendant complains is, in effect, that the trial court's interpretation of title 3, section 6614 conflicted with the deputy commissioner's interpretation. As a threshold matter, we find that the trial court's interpretation was the correct one.

 Again we note that title 3, section 6614 requires a pesticide applicator "prior to and while applying a pesticide" (*id.,* subd. (a)) to evaluate the weather and other circumstances "to determine the likelihood of harm or damage" (*ibid.*) and to defer or halt a pesticide application if there is "a reasonable possibility of damage to nontarget crops" (*id.,* subd. (b)(2)). The

plain meaning of the section is that an evaluation be made "prior to and while" applying a pesticide. The section *does not* say that an application must be deferred only if there is a reasonable possibility of damage occurring prior to or while the pesticide is being applied. It imposes no limit upon when the possible damage might occur. If the reasonable possibility of damage may be predicted prior to or while applying a pesticide, the application must be deferred or aborted. It may be, as a factual matter, that postapplication drift is not something a pesticide applicator could determine prior to or while applying a pesticide. If so, damage resulting from postapplication drift would not be the result of a violation of title 3, section 6614. But if the mandated evaluation would reveal a "reasonable possibility" that postapplication drift will damage nontarget crops, then title 3, section 6614 imposes a duty upon the pesticide applicator to defer or cease the application.

 The trial court was not bound to defer to the deputy commissioner's interpretation. It is the job of the court to interpret the laws and construe the law the agencies are charged with enforcing. (*Hewlett v. Squaw Valley Ski Corp.* (1997) 54 Cal.App.4th 499, 526 [63 Cal.Rptr.2d 118].) We find nothing in the pesticide laws that would confine the court's exercise of this judicial power to the direct review of administrative decisions. Since the question is a purely legal one, there is no advantage to calling upon the agency's factfinding expertise. (Cf. *Tenderloin Housing Clinic, Inc. v. Astoria Hotel, Inc.* (2000) 83 Cal.App.4th 139, 142–143 [98 Cal.Rptr.2d 924].)

 It is true that the statutory scheme contemplates that the commissioners will exercise ongoing, day-to-day, local oversight of pesticide use. Section 11501, subdivision (d) states that one of the express purposes of the law is to "permit agricultural pest control by competent and responsible licensees and permittees *under strict control of the director and commissioners.*" (Italics added.) The comprehensive nature of the applicable statutory schemes, along with the Legislature's express intent to occupy the whole field of regulation (§ 11501.1), reveals a legislative intent to confine the process for adjudication of violations of the pesticide laws to the agencies charged with enforcement. In this case, however, the issue was whether defendant's past conduct had been negligent. By giving the negligence per se instruction the trial court was not allowing the jury to adjudicate defendant's guilt or innocence. Insofar as defendant's liability under the pesticide laws is concerned, that was decided by the deputy commissioner. Nothing that occurred in the context of this case changed that.

Defendant's argument is similar to one rejected by our Supreme Court in connection with a preemptive federal law. In *Elsworth v. Beech Aircraft Corp.* (1984) 37 Cal.3d 540 [208 Cal.Rptr. 874, 691 P.2d 630] (*Elsworth*), "Beech's claim [was] that the jury should have been compelled to give determinative

effect to the [Federal Aviation Administration] decision that the Travel Air [aircraft] complied with all applicable safety regulations, and that it was error to give the negligence per se instruction to the effect that Beech was guilty of negligence if the Travel Air did not meet the regulations. Beech urge[d] that the effect of the instruction was to allow the jury to second-guess the FAA decision that the Travel Air complied with the regulations, thereby intruding into a field preempted by federal law." (*Id.* at p. 547.)

The Supreme Court noted that, since the federal law clearly allowed state tort remedies, the critical issues were "whether there is an 'irreconcilable conflict between the federal and state standards or whether the imposition of a state standard in a damages action would frustrate the objectives of the federal law.' (*Silkwood*[ *v. Kerr-McGee Corp.* (1984)] 464 U.S. [238,] 256 [78 L.Ed.2d 443, 104 S.Ct. 615]." (*Elsworth, supra,* 37 Cal.3d at p. 549.) *Elsworth* discerned no irreconcilable conflict. "Even if the jury found that the Travel Air was defective on the basis of the negligence per se instruction, this would have no effect on the FAA's power to certify aircraft, or on the validity of its certification decisions. It is important to note that the negligence per se instruction plays a very limited role in the context of a state court's obligation to accord deference to the FAA's decisions regarding the safety of aircraft. In essence, it allows the jury to find defective an airplane design that the FAA has approved as safe. But a jury may make the same determination without the instruction because, as Beech concedes, it could find a manufacturer liable for defective design even if the airplane complies with every regulation. The negligence per se instruction therefore affects only the jury's *reason* for finding a design defect, rather than its power to find such a defect in the face of FAA certification." (*Id.* at p. 550.)

*Elsworth* also determined that administration of the FAA (Federal Aviation Administration) certification program was not threatened by allowing a state to hold a manufacturer liable under negligence per se principles. "If anything, the converse is true. . . . An inquiry in a state court into whether the manufacturer in fact complied with the regulations, such as the extensive testimony in the present case of post-accident flight tests of the Travel Air and the relation of the results of those tests to the requirements of the safety regulations, would assist the FAA in policing a manufacturer's compliance rather than hampering the agency in this regard." (*Elsworth, supra,* 37 Cal.3d at p. 550.) The court went on, "The purpose of the regulations is to protect those who fly in airplanes or are affected by their flight. [Citations.] This goal would be enhanced rather than defeated by allowing a jury to consider whether the design of an aircraft complies with safety regulations. . . . A state court investigation of the issue in the context of an action for damages promotes the safety of the traveling public by revealing violations or defects which may not have come to the attention of the FAA at the time it issued the certificate." (*Id.* at p. 551, fn. omitted.)

Our analysis in this case is similar. The question is whether application of the negligence per se doctrine interferes with the Legislature's express intent to ensure uniform statewide regulation of the pesticide laws. We conclude that it does not. As we have explained, the jury did not need to find defendant violated the law in order to find defendant to have been negligent. Compliance with the law is not a complete defense to negligence. Thus, as in *Elsworth*, the instruction affected only the jury's reason for finding defendant negligent. It had no effect upon the DPR's ability to regulate pesticide use nor upon the commissioner's ability to enforce the law.

### 5. Common Law Claims Pertaining to the Place a Pesticide Is Applied

We also reject defendant's argument that the pesticide laws bar common law claims based solely upon the *place* a pesticide is used. In an action for damages arising from the application of restricted-use pesticides, the place of application will always be inextricably connected in some way to the manner and timing of the application. Since the Legislature clearly intended to preserve common law claims for damages, we are reluctant to find one factual basis for such a claim to be precluded where there is no express legislative indication to that effect. Furthermore, defendant's argument is, in effect, that where the claim relates only to the place, a use permit makes a defendant absolutely immune from liability. But again, although compliance with the law or with the conditions of a permit may be evidence that the defendant was not negligent, it is not conclusive of the issue.

Defendant makes much of the in terrorem effect of civil suits, arguing that they regulate behavior as much as any local ordinance can. But the argument has no bearing upon our decision. If a civil suit seeking compensation for an injury caused by the negligent application of a pesticide causes a pesticide applicator to take additional precautionary measures, so be it. It is the law that if a pesticide applicator knows or should know that an injury is the reasonably possible result of applying a pesticide in a particular place, the mere existence of a permit does not give the pesticide applicator a license to ignore those consequences. (Tit. 3, § 6614.)

### 6. Nuisance

Defendant's final argument is that the trial court erred in refusing to strike plaintiff's nuisance cause of action on the ground it was barred by Civil Code

section 3482. That section provides, "Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance." In the alternative, defendant maintains that the court erred in refusing to instruct the jury in the language of that section. According to defendant, its pesticide applications cannot be deemed a nuisance because they were specifically authorized by the site and time-specific permits issued by the commissioner.

■ In general, our Supreme Court has "consistently applied a narrow construction to [Civil Code] section 3482 and to the principle therein embodied." (*Greater Westchester Homeowners Assn. v. City of Los Angeles* (1979) 26 Cal.3d 86, 100 [160 Cal.Rptr. 733, 603 P.2d 1329].) The statutory protection of Civil Code section 3482 does not apply " ' "unless the acts complained of are authorized by the express terms of the statute under which the justification is made, or by the plainest and most necessary implication from the powers expressly conferred, so that it can be fairly stated that the Legislature contemplated the doing of the very act which occasions the injury." ' " (*Varjabedian v. City of Madera* (1977) 20 Cal.3d 285, 291 [142 Cal.Rptr. 429, 572 P.2d 43] (*Varjabedian*), quoting *Hassell v. San Francisco* (1938) 11 Cal.2d 168, 171 [78 P.2d 1021].) "A requirement of 'express' authorization embodied in the statute itself insures that an unequivocal legislative intent to sanction a nuisance will be effectuated, while avoiding the uncertainty that would result were every generally worded statute a source of undetermined immunity from nuisance liability." (*Varjabedian, supra,* at p. 291.) Thus, it is necessary that the courts scrutinize the legislative enactment in question to ascertain whether a legislative intent exists to sanction the alleged nuisance. (*Greater Westchester Homeowners Assn. v. City of Los Angeles, supra,* at p. 102; *Jordan v. City of Santa Barbara* (1996) 46 Cal.App.4th 1245, 1258 [54 Cal.Rptr.2d 340]; *Zack's, Inc. v. City of Sausalito* (2008) 165 Cal.App.4th 1163, 1179 [81 Cal.Rptr.3d 797].)

Defendant relies upon *Farmers Ins. Exchange v. State of California* (1985) 175 Cal.App.3d 494 [221 Cal.Rptr. 225] (*Farmers*), in which this court held that Civil Code section 3482 precluded liability for nuisance and trespass to chattel in connection with the aerial spraying of malathion during the Mediterranean fruit fly (medfly) infestation of the 1980's. The program eradicated the medfly but it also damaged the paint on automobiles exposed to the chemicals in the sprayed areas. A group of insurance companies sued the state seeking compensation for property damage suffered by their insureds. (*Farmers, supra,* at p. 498.) The trial court sustained the defendant's demurrer. (*Id.* at pp. 498–499.)

This court concluded that both Civil Code section 3482 and the common law defense of necessity barred the plaintiffs' nuisance and trespass causes of action. The spraying had been conducted pursuant to a declared state of emergency under the Emergency Services Act (Gov. Code, § 8625 et seq.). (*Farmers, supra,* 175 Cal.App.3d at pp. 500–501.) The law authorizing the aerial spraying designated specific medfly eradication areas and set forth the means and methods that could be employed to control or eradicate the pest. (*Id.* at pp. 499–501; tit. 3, § 3591.5.) The Food and Agricultural Code then, as now, declared that an infestation like the medfly infestation is itself a public nuisance subject to abatement. (§ 5762; *Farmers, supra,* at p. 500, fn. 2.) Therefore, because the alleged nuisance—the release of a chemically destructive spray into the atmosphere—was "precisely" what the law authorized, Civil Code section 3482 was fully exculpatory, relieving the state from liability for both nuisance and trespass. (*Farmers, supra,* at p. 503.) *Farmers* rejected the plaintiffs' contention that the governor's proclamation did not " 'expressly authorize' " the state to damage automobile paint. "The authorizing statute need not predict the precise nature of the damages. It need only authorize the governmental action." (*Ibid.*)

Defendant refers to *Farmers*'s holding that a statutory authorization "need not predict" the nature of the damages, arguing that in this case the permits authorized its application of pesticides to the Brussels sprouts field and need not have predicted the particular injury plaintiff alleged. We reject the argument. The damaged property in *Farmers* was located in the very place the law authorized the chemical to be sprayed. Here, the permits authorized application to the Brussels sprouts fields but the damage occurred on plaintiff's land. It is undisputed that defendant was not authorized to spray there.

*Farmers* is also distinguishable because the appellate court relied not only upon Civil Code section 3482 but also upon the defense of necessity. Quoting the standard treatise, *Farmers* explained, "Necessity is a complete defense to these torts. 'A defendant who acts to prevent a threatened injury from some force of nature, or some other independent cause not connected with the plaintiff, is said to be acting under necessity. . . . [¶] . . . Where the danger affects the entire community, or so many people that the public interest is involved, that interest serves as a complete justification to the defendant who acts to avert the peril to all. . . .' (Prosser and Keeton, Torts (5th ed. 1984) pp. 145–146.)" (*Farmers, supra,* 175 Cal.App.3d at p. 503.) In this case, defendant's conduct was confined to its own economic interests and those of

its clients. There was no public emergency nor facts upon which defendant could assert the necessity defense.

*Farmers* is one of only a handful of cases applying the Civil Code immunity. In general, the cases that apply the protection do so where the alleged nuisance is exactly what was lawfully authorized (*Jordan v. City of Santa Barbara, supra,* 46 Cal.App.4th at p. 1259 [wastewater discharge permit allowed maximum amount of certain substances]; *Carson Harbor Village, Ltd. v. Unocal Corp.* (9th Cir. 2001) 270 F.3d 863, 870 [permit authorized pollutants contained in storm water discharge]) or is the inescapable result of the authorized act (*Harding v. State of California ex rel. Dept. of Transportation* (1984) 159 Cal.App.3d 359, 362 [205 Cal.Rptr. 561] [dust, dirt, straw generated by authorized freeway construction]; *Orpheum Bldg. Co. v. San Francisco Bay Area Rapid Transit Dist.* (1978) 80 Cal.App.3d 863, 875–876 [146 Cal.Rptr. 5] [noise, dust, and fumes from authorized construction of rapid transit system]; *Friends of H Street v. City of Sacramento* (1993) 20 Cal.App.4th 152, 163–164 [24 Cal.Rptr.2d 607] [traffic, noise, fumes, and litter on city streets]). This case does not fall into either category.

*Varjabedian, supra,* 20 Cal.3d 285, is closer to the facts before us. *Varjabedian* concerned a sewage treatment plant that emitted noxious odors. The Supreme Court held that Civil Code section 3482 did not shield the defendant from liability for nuisance because the statutes authorizing the construction of sewage treatment plants could not be read to authorize the emission of bad odors. (*Varjabedian, supra,* at p. 292.) To the contrary, one object of sewage treatment facilities was to remove noxious effluents from the environment. (*Ibid.*)

 Here, the permits authorized application of the pesticides to the Brussels sprouts fields surrounding plaintiff's farm; they did not authorize application of pesticides or the damage to plaintiff's crop. To the extent a permit may be deemed to authorize any particular application of pesticide, it does so within the context of a statutory and regulatory scheme designed to insure that pesticides are used effectively with minimum risk of injury to persons, property, and the environment. Like the statutes in *Varjabedian*, the pesticide laws and the permits issued by the commissioners are intended to prevent, not authorize, the very nuisance alleged here.

We conclude, therefore, that plaintiff's nuisance cause of action was not barred by Civil Code section 3482. It follows that the trial court did not err in refusing to strike the nuisance cause of action or in failing to instruct the jury in the language of Civil Code section 3482.

## V. DISPOSITION

The judgment is affirmed. The parties shall bear their own costs on appeal.

Rushing, P. J., and Elia, J., concurred.