Filed 3/8/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| KLEAN W. HOLLYWOOD, LLC, | B283816 |
| Petitioner, | (Los Angeles County Super. Ct. No. BC544414) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| LANGSTON JACKSON, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS in mandate. Gerald Rosenberg, Judge. Petition granted.

Beach Cowdrey Jenkins, Thomas E. Beach and Darryl C. Hottinger for Petitioner.

Hiepler & Hiepler, Mark O. Hiepler and Marc D. Anderson for Real Party in Interest.

---

Petitioner Klean W. Hollywood, LLC (Klean), a voluntary drug abuse treatment facility, was sued by real party Langston Jackson, who had enrolled at the facility to obtain treatment for drug addiction. Jackson blamed Klean for the injuries he suffered after smuggling heroin into his room and injecting it late one night. Jackson claimed that Klean was negligent in failing to prevent him from obtaining heroin and failing to discover him unconscious in his room until the next morning. Klean moved for summary judgment, contending that the common law doctrine of unclean hands precluded Jackson, or anyone who engages in the illegal acts of buying and using illicit drugs, from pursuing a negligence claim. Klean further contended that the Drug Dealer Liability Act (Health & Saf. Code, § 11700, et seq., DDLA or the Act) -- which permits users of certain illegal controlled substances, under limited circumstances, to pursue claims against providers of such substances -- prohibits drug users from pursuing claims against parties other than the drug dealers described in the Act.[1] Although we conclude that the DDLA does not categorically preclude claims against third parties, we hold that on the undisputed facts of this case, Jackson has no basis

---

[1] Undesignated statutory references are to the Health and Safety Code.

2

to pursue a negligence claim against Klean.  Accordingly, we grant the writ petition.

## FACTUAL AND PROCEDURAL BACKGROUND

The essential facts are not in dispute.  Klean operates a residential substance abuse treatment facility as defined by Health and Safety Code section 11834.02, subdivision (a).  The facility provides room, board, recreational activities, individual and group therapy, and drug testing, but not medical care.

On February 25, 2013, real party Langston Jackson, then 22, voluntarily entered the treatment facility.  He signed an admission agreement stating that if a resident consumed alcohol or illicit drugs "that resident will be terminated from [the] treatment program."  "[L]eaving [the] grounds without permission" was also a basis for discharge.  It was "understood and agreed" that residency in the program was voluntary.  The agreement stated that the facility was a "non-medical treatment facility."  Psychiatric and medical services were to be contracted "independently between the participant and physicians," and if the patient required immediate medical treatment, he or she would be transported to an emergency room.

Sometime prior to March 15, 2013, Jackson told his roommate that he wanted to get high.[2]  On March 15, the

---

[2]  According to Jackson's counterstatement and supporting evidence, he tested positive for benzodiazepines on March 11 and March 14, indicating he had previously accessed illicit drugs during his stay at the facility.  This alarmed his therapist, Kim Farber, who questioned whether Jackson "really wanted to be there," and (*Fn. continued on the next page.*)

3

roommate called a drug dealer friend, who brought heroin and syringes to the facility at approximately 10:00 p.m. Jackson and his roommate obtained the drugs and paraphernalia by lowering a plastic bag attached to shoelaces outside their second-story window. The two men waited to inject the drugs until approximately 3:00 a.m., after a staff member had checked on them. Jackson's roommate injected himself in the bathroom, and went to bed. When he awoke at 7:15 a.m., he observed Jackson, lying on the couch, where Jackson often slept. Unable to rouse Jackson, the roommate alerted staff, and Jackson was taken to the hospital, where he was eventually revived.

Jackson brought a complaint against Klean for negligence.[3] The complaint focused on Klean's alleged "fail[ure] to take reasonable steps to ensure residents . . . could not get drugs or other contraband while on [its] premises," specifically alleging that Klean "did not have alarms on any of the windows in any of the residential units" and "did not have cameras monitoring the publicly-accessible areas in front of the units . . . ." The complaint also alleged that Klean "failed to comply with its policies regarding cell phones," allowing Jackson to retain the phone used to call the drug dealer; "failed

wrote an email to his consulting psychiatrist Jason Coe., M.D. Dr. Coe decided that Jackson's situation should be discussed with staff at the next treatment team meeting.

[3] Jackson also asserted a claim for dependent adult neglect to which a demurrer was sustained. Klean filed a cross-claim seeking payment for its services under the Agreement. Neither of those claims is before us.

4

to adequately staff the overnight shift," although it "knew that a resident was more likely to relapse on the overnight shift than during the day"; "failed to take reasonable steps after [Jackson's] two positive drug tests," such as having him more closely monitored or supervised; and failed to conduct regular room checks which could have led to the discovery of the drugs and syringes and/or Jackson's post-injection condition.[4] According to the complaint, Jackson was in a coma for 37 days and suffered physical and cognitive injuries.

Klean moved for summary judgment, contending that the negligence claim was barred because "the alleged injury arose from [Jackson's] own misconduct," and that principles of common law precluded drug users from recovering for injuries resulting from their use of illegal drugs. Klean further contended that the DDLA "provides the exclusive means by which a drug user (or his family) can recover damages for injuries caused by the drug user's voluntary use of an illicit substance," and that the Act precludes recovery unless "the defendant is the one who provided the illicit substance to the plaintiff." (Bold omitted.) Klean relied on subdivisions (a) and

_____

[4] The complaint also cited provisions of the California Code of Regulations governing residential drug treatment facilities -- title 9, sections 10563, 10564, subdivisions (b) and (k), 10567, subdivision (e), 10569, subdivision (a)(3), 10572, subdivision (e), and 10581, subdivision (a) -- contending that Klean failed to establish or implement policies regarding the safe operation of the facility, failed to employ competent staff in adequate numbers, failed to train employees, failed to provide safe and healthful accommodations, and failed to limit or monitor facility access by unauthorized persons and persons under the influence of drugs.

5

(b) of section 11706 of the DDLA.  Subdivision (a) provides: "An individual user of an illegal controlled substance may not bring an action for damages caused by the use of an illegal controlled substance, except as otherwise provided in this section," and proceeds to set forth the limited circumstances under which such a claim may be asserted.  Subdivision (b) provides:  "[An individual user of an illegal controlled substance] entitled to bring an action under this section may seek damages only from a person who manufactured, transported, imported into this state, sold, possessed with intent to sell, furnished, administered, or gave away the specified illegal controlled substance actually used by the individual user of an illegal controlled substance."

Jackson opposed the motion, contending that "Klean negligently created an environment that led to his possession and overdose," and failed to take "reasonable steps" to prevent him from obtaining and using drugs, such as alarming its windows, installing surveillance cameras or confiscating his cell phone, despite "numerous signs that he was likely to relapse."  Jackson further contended that Klean failed to adequately monitor him, leading to his lying "unresponsive, on the sofa in his unit for over four hours."[5]  Jackson argued that the provisions of the DDLA allowing a drug user to pursue claims for injury against his or her supplier did not absolve

_____

[5] Jackson also contended that Klean violated the regulations governing residential drug treatment facilities, citing the regulations set forth in his complaint, without specifying how any had been violated.

6

other defendants of liability for negligence; nor, he argued, did it displace common law.

The trial court denied the motion for summary judgment. Its order stated: "Health and Safety Code Section 11706 does not preclude [Jackson] from filing a common law negligence claim against [Klean]. The claim is that [Klean] did not monitor [Jackson] which led to his obtaining drugs and overdosing."

Klean petitioned for a writ of mandate, seeking reversal of the trial court's order. We issued an alternative writ of mandate and order to show cause. We now conclude that the DDLA does not preclude a user of an illegal controlled substance subject to the Act from pursuing a common law claim.[6] However, on the record before us we find no basis in common law to impose liability on Klean, the unlocked drug treatment facility Jackson voluntarily entered, for failing to prevent him from consuming drugs he smuggled into the facility. We further conclude that the undisputed facts establish that Klean was not negligent in failing to discover Jackson earlier, in order to seek medical treatment for him.

---

[6] The drugs to which the DDLA applies are described in section 11703, subdivision (l), which defines the "'[s]pecified illegal controlled substance[s]'" to include "cocaine, phencyclidine, heroin, or methamphetamine," as well as any of the substances that form the basis of violations of sections 11351, 11351.5, 11352, 11358 to 11360, 11378.5, 11379.5 and 11383.

**DISCUSSION**

A. *Claims Based on Failure to Prevent Jackson from Acquiring and Ingesting Drugs*

Jackson contends the DDLA does not bar his common law negligence claim or "absolve Klean of liability for its negligence in creating an environment that allowed Jackson to get and use heroin, its negligence in failing to take reasonable steps to prevent Jackson from getting and using heroin, its negligence in monitoring Jackson, or its negligence in its four-hour delay before discovering him unresponsive." We address in this section Jackson's claims that Klean may be liable for creating an environment that allowed him to use heroin and for failing to take steps to prevent him from obtaining and using it. We thereafter address his claim that Klean was negligent in failing to monitor him or to discover he was unconscious.

1. *The DDLA*

Klean contends the DDLA provides a basis to reject Jackson's claims. Specifically, it argues that the Act occupies the field of claims permitted by drug users or those injured by drug users, leaving no opening for common law claims.[7] We

---

[7] Klean contends that section 11706 "preempts" common law. As explained in *Jacobs Farm/Del Cabo, Inc.* (2010) 190 Cal.App.4th 1502, "[p]reemption applies where federal law supersedes state law or state law supersedes local law." (*Id.* at p. 1521.) Where the issue concerns "allegedly conflicting provisions of coequal state laws -- state statutes and state common law . . . the question presented is better articulated as whether the enactment of [the subject law]
(*Fn. continued on the next page.*)

conclude the DDLA was not intended to displace the common law in this area.

The DDLA's genesis is the "Model Drug Dealers Liability Act" (the Model Act) presented to state legislators in the early 1990's by the "American Legislative Exchange Council" to provide "'a means for parents and others to obtain monetary damages from drug dealers for the injuries caused by drugs to their family and communities.'" (145 Am.Jur. (rev. 2017) Trials § 2.) More than 20 states have adopted the Model Act or a version of it. (*Ibid.*; see, e.g. Ark. Code Ann. § 16-124-101, et seq.; Col.Rev. Stat. Ann. § 13-21-801, et seq.; Ga. Code Ann., § 51-1-46; Haw. Rev. Stat. Ann., § 663E-1, et seq.; Mich. Comp. Laws Ann. § 691.1601, et seq.)[8] The Council's Web site currently describes the goals of the Model Act: "(1) to allow all persons and companies harmed by illegal drugs to bring suit for damages against all persons who are part of the drug

---

displaced the common law that previously governed the subject in dispute." (*Ibid.*)

[8] Some commentators attribute the passage of the Model Act to the 1995 death of actor Carroll O'Connor's son, Hugh, following a long struggle with drug addiction, and O'Connor's unsuccessful attempt to recover compensation from his son's drug dealer. (See Kevin G. Meeks, *From Sindell to Street Pushers: Imposing Market Share Tort Liability on Illegal Drug Dealers* (1998) 33 Ga. L.Rev. 315, 317; Joel W. Baar, *Let the Drug Dealer Beware: Market-Share Liability in Michigan for the Injuries Caused by the Illegal Drug Market* (1997) 32 Val. U. L.Rev. 139, 205, fn. 36.) Indeed, Florida's Drug Dealer Liability Act specifically provides that it "may be cited as the 'Hugh O'Connor Memorial Act.'" (Fla. Stat. Ann., § 772.12, subd. (1).)

distribution network within their 'target community'; (2) to deter people from becoming part of the drug distribution network; and (3) to encourage users to seek treatment and encourage companies to provide treatment, knowing that reimbursement may be possible from drug dealers themselves." (http://www.modelddla.com/Imposing_Products_Liability_ for_Illegal_Drugs.htm.)

The DDLA was enacted by the California Legislature in 1996. (Stats. 1996, ch. 867, § 1, p. 1.) Echoing the language and intent of the Model Act, the DDLA provides that its purposes are to provide a civil remedy for damages to persons injured as a result of another's use of an illegal controlled substance, such as "parents, employers, insurers, governmental entities, and others who pay for drug treatment or employee assistance programs, as well as infants injured as a result of exposure to controlled substances in utero"; "establish the prospect of substantial monetary loss as a deterrent to those who have not yet entered into the distribution market for illegal controlled substances"; and "establish an incentive for users of illegal controlled substances to identify and seek payment for their own treatment from those dealers who have sold illegal controlled substances to the user in the past." (§ 11701.) The aim is to "shift, to the extent possible, the cost of the damage caused by the existence of the market for illegal controlled substances in a community to those who illegally profit from that market." (*Ibid.*)

Unlike the drafters of the Model Code, however, the Legislature did not suggest that existing California law precluded pursuit of a claim against a drug dealer. The initial

Senate Judiciary Committee report stated that "[e]xisting [l]aw" made it "illegal for a person to sell or distribute specified controlled substances," and held "every person civilly liable for injuries proximately caused by the person's negligence or willful acts." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1754 (1995-1996 Reg. Sess.) as amended Apr. 22, 1996, pp. b, c.) In explaining the change in law anticipated, the report first described the "'market share' liability" theory set forth in *Sindell v. Abbott Laboratories* (1980) 26 Cal.3d 588, which permitted "a producer of a fungible product [to] be held civilly liable . . . for damage caused by the product sold by the defendant and several other manufacturers, without proof that the defendant's product was a direct cause of the plaintiff's injury," and then stated: "[T]he proposed provision imposes 'market liability,' which is broader than the 'market share' liability doctrine of *Sindell.* Under the proposal, a drug dealer who is engaged in a pattern of marketing illegal drugs can be held liable for damages suffered by any person as a result of his or another person's use of the same type of illegal drug sold by that dealer." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1754, *supra,* at pp. c & d.) The Act's "expansion of the market share liability doctrine" was justified "in order to deter drug traffickers with potentially high civil damages awards." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1754, *supra,* at p. e.)

To meet the Legislature's goals, section 11704 provides that "[a] person who knowingly participates in the marketing of illegal controlled substances within this state is liable for

civil damages as provided in [the DDLA]."[9]  Section 11705 describes the non-users who "may bring an action for damages caused by an individual's use of an illegal controlled substance."[10]  (§ 11705, subd. (a).)  Persons or entities coming within section 11705 may recover a full panoply of damages, including "any . . . pecuniary loss proximately caused by the use of an illegal controlled substance" and "[n]oneconomic damages, including, but not limited to, physical and emotional

[9]      As originally enacted, the phrase the "marketing of illegal controlled substances" was defined to mean possession for sale, sale or distribution.  (Stats. 1996, ch. 867, § 1, p. 2.)  To "[p]articipate in the marketing of illegal controlled substances" meant "to transport, import into this state, sell, possess with intent to sell, furnish administer, or give away, or offer to transport, import into this state, sell, furnish, administer, or give away a specified illegal controlled substance."  (*Ibid*.)  In 2005, the Act was amended to include within the definition of marketing "all aspects of making such a controlled substance available, including, but not limited to, its manufacture."  (Stats. 2005, ch. 88, § 1, p. 1; see § 11703, subd. (a).)  In addition, "[p]articipate in the marketing of illegal controlled substances" was redefined to include "the manufacturing of an illegal controlled substance."  (Stats. 2005, *supra*, at p. 2; see § 11703, subd. (g).)

[10]      These include "[a] parent, legal guardian, child, spouse, or sibling of the individual controlled substance user," "[a]n employer of the individual user of an illegal controlled substance," "[a] medical facility, insurer, employer, or other nongovernmental entity that funds a drug treatment program or employee assistance program for the individual user of an illegal controlled substance or that otherwise expended money on behalf of the individual user of an illegal controlled substance," and "[a] person injured as a result of the willful, reckless, or negligent actions of an individual user of an illegal controlled substance."  (§ 11703, subd. (a)(1), (3), (4), (5).)

pain, suffering, physical impairment, emotional distress, medical anguish, disfigurement, loss of enjoyment, loss of companionship, services and consortium . . . ." (*Id.*, subd. (d)(1), (2).) Such damages may be recovered not only from the person who "sold, administered, or furnished an illegal controlled substance to the individual user of the illegal controlled substance," but also from persons who "knowingly participated in the marketing of illegal controlled substances," provided certain conditions apply. (§ 11705, subd. (b)(1), (2), (B)-(D).)[11]

Section 11706 governs the more limited claims available to drug users themselves under the Act. An individual illegal drug user may bring an action for damages caused by the use of drugs "only if all of the following conditions are met: [¶] (1) The individual personally discloses to narcotics enforcement authorities all of the information known to the individual regarding all that individual's sources of illegal controlled substances. [¶] (2) The individual has not used an illegal controlled substance within the 30 days before filing the action. [¶] (3) The individual continues to remain free of the use of an illegal controlled substance throughout the pendency of the action." A drug user who meets these conditions is subject to two further limitations under section 11706: he or she may

---

[11] To ensure that damages are paid from illicit drug money, section 11707 precludes insurers or others from "pay[ing] damages awarded under this division," or "provid[ing] a defense or money for a defense, on behalf of an insured under a contract of insurance or indemnification." (§11707, subd. (a).)

13

seek damages "only from a person who manufactured, transported, imported in this state, sold possessed with intent to sell, furnished, administered, or gave away the specified illegal controlled substance actually used by the individual user of an illegal controlled substance" (§ 11706, subd. (b)), and may not recover non-economic damages. (*Id.*, subd. (c).)[12]

Notably, in securing these rights for drug users, the Legislature stated in the first sentence of section 11706: "An individual user of an illegal controlled substance may not bring an action for damages caused by the use of an illegal controlled substance, except as otherwise provided in this section." Determining whether the DDLA precludes actions by drug users against non-dealer parties requires that we construe this sentence.[13] Klean contends that our task is an easy one: the plain language does not allow an action for damages caused by the plaintiff's use of an illegal controlled substance unless the defendant furnished the illegal substance to the plaintiff and the plaintiff otherwise meets the conditions of subdivision 11706. Jackson contends that the phrase "under this Act" or "under this division" is implied after the words "bring an action for damages," and that absent evidence the Legislature intended the DDLA to be the exclusive remedy for drug users

---

[12]    In addition to the limitations imposed on drug users, section 11712 provides that for all claimants under the Act "[p]roof of liability . . . shall be shown by clear and convincing evidence."

[13]    Because the trial court's decision was based on interpretation of a statute, our review is de novo. (See *Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332; *Riske v. Superior Court* (2016) 6 Cal.App.5th 647, 657.)

and others injured by the use of an illegal controlled substance, the Act does not displace the common law.

The paramount rule in statutory construction requires courts to give the words of a statute their ordinary and usual meaning. (*Kibler v. Northern Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 199; see *People v. Johnson* (2002) 28 Cal.4th 240, 244 ["[T]he Legislature is presumed to have meant what it said, and the plain meaning of the statute governs"].) However, we are also obliged to construe the words in their "statutory context" (*Kibler, supra,* at p. 199), and "interpret the statute as a whole, so as to make sense of the entire statutory scheme. [Citation.]" (*Carrisales v. Department of Corrections* (1999) 21 Cal.4th 1132, 1135; see also *In re Nolan W.* (2009) 45 Cal.4th 1217, 1235 [When a statutory provision is part of a complex statutory scheme, "a single provision 'cannot properly be understood except in the context of the entire . . . process of which it is part'"].) The rules of construction are not "mechanical rules for the determination of statutory meaning," but "aids in support of '[t]he fundamental task of statutory construction,' which is to "'ascertain the intent of the lawmakers so as to effectuate the purpose of the law.""' (*People v. Frawley* (2000) 82 Cal.App.4th 784, 789.) Statutory provisions must be accorded "'a reasonable, commonsense construction in line with [their] apparent purpose, in order to advance wise legislative policy and avoid absurdity.'" (*People v. Fairmont Specialty Group* (2009) 173 Cal.App.4th 146, 153.)

Applying these principles, we conclude that the language of the first sentence of section 11706 circumscribing suits by

individual users was intended to apply solely to actions for damages brought under the DDLA. Notably, the definition of an individual user set forth in subdivision (b) of section 11703 is itself limited to those suing under the Act: "'Individual user of an illegal controlled substance' means the individual whose use of a specified illegal controlled substance *is the basis for an action brought under this division.*" (Italics added.) Thus, the Legislature had no cause to add the words "under this Act" or "under this division," as that limitation was implicit in the definition of "[i]ndividual user."

Our conclusion is further confirmed by the general rule that statutes do not supplant or displace the common law "'unless it appears that the Legislature intended to cover the entire subject or, in other words, to "occupy the field."'" (*K.C. Multimedia, Inc. v. Bank of America Technology & Operations, Inc.* (2009) 171 Cal.App.4th 939, 953, quoting *I.E. Associates v. Safeco Title Ins. Co.* (1985) 39 Cal.3d 281, 285; accord, *Jacobs Farm/Del Cabo, Inc. v. Western Farm Service, Inc.*, *supra*, 190 Cal.App.4th at p. 1521.) A legislative intent to "'totally supersede and replace the common law dealing with the subject matter'" does not generally appear unless the legislation is "'comprehensive'" and "'minutely describe[s]'" such things as "'course of conduct, parties, things affected, limitations and exceptions.'" (*I. E. Associates v. Safeco Title Ins. Co.*, *supra*, at p. 285, quoting 2A Sutherland, Statutory Construction (Sands 4th ed. 1984) § 50.05, pp. 440-441; see *Gray v. Sutherland* (1954) 124 Cal.App.2d 280, 290, quoting 15 C.J.S., Common Law, § 12, p. 620 ["The correct rule as to the relation of the common law and the statutory law is . . . 'the

common law is not repealed, by implication or otherwise, if there is no repugnancy between it and the statute, and it does not appear that the legislature intended to cover the whole subject'"].) Section 11706 is part of the DDLA, an enabling statute designed to authorize, under certain specified circumstances, claims against those involved in the sale or marketing of illicit drugs. The DDLA provides precise rules for pursuing drug dealers and all those who sell, administer, furnish or market illegal controlled substances. It does not, however, purport to represent a legislative attempt to supplant common law or control the entire universe of circumstances in which parties injured by someone's use of drugs, or the drug user himself, may pursue third parties.

Finally, we are guided by the principle that when interpreting statutes "consideration should be given to the consequences that will flow from a particular interpretation." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387.) Interpreting the DDLA as occupying the field of claims in this area could lead to unwelcome outcomes for those who might otherwise have an avenue for pursuing common law claims, as illustrated by *Cook v. Kendrick* (La.App. 2006) 931 So.2d 420. There, parents of a young man who died of a drug overdose while at the home of a friend obtained a recovery based in part on the failure of the friend to seek medical assistance for a significant period of time after observing the young man collapse. On appeal, the friend's homeowner insurer argued it was prohibited from defending or paying any damages under Louisiana's "Drug Dealer Act," which contained a provision similar to section

17

11707.  (*Cook v. Kendrick, supra,* at p. 430.)  The appellate court disagreed, concluding that the parents "were not legally bound to bring their claims against [the homeowner] under the [Drug Dealer] Act" because "alternative theories of recovery . . . are not barred" under it.  (*Cook v. Kendrick, supra,* at p. 430.)  In view of our Legislature's expressed intention to expand existing law to include a broader class of potentially culpable parties, we decline to interpret the DDLA to restrict otherwise available common law remedies.

### 2.  *Common Law*

Jackson cites no authority for the proposition that a voluntary drug treatment facility whose sole alleged fault was a failure to prevent him from obtaining and consuming drugs could be liable for the injuries he suffered.  Nor have we found any.  As Klean points out, many states preclude claims by drug users entirely, under the "wrongful conduct rule," which embraces the policy that "courts should not lend their aid to a plaintiff who founded his cause of action on his own illegal conduct."  (*Orzel v. Scott Drug Co.* (1995) 449 Mich. 550, 560-563 [537 N.W.2d 208] [user's guardian could not pursue claim against pharmacy that supplied him prescription drugs; user violated controlled substances act when he obtained drugs without valid prescription]; accord, *Kaminer v. Eckerd* (Fla.Dist.Ct.App. 2007) 966 So.2d 452, 453 [estate of student who died after ingesting prescription drug stolen from defendant's pharmacy was precluded by student's wrongful conduct from pursuing claim based on defendant's failure to follow federal regulations and its own procedures for

safeguarding controlled substances]; *Prince v. B.F. Ascher Co., Inc.* (Okla.Ct.App. 2004) 90 P.3d 1020, 1028 [where plaintiff sued manufacturer of nasal inhaler after her husband died while using it to get high, court held: "'[T]he general rule is that, absent special circumstance, no duty is imposed on a party to anticipate and prevent the intentional or criminal acts of a third party'"].)

Klean contends that California common law and, in particular, the doctrine of unclean hands represents an absolute bar to a claim by users of illicit substances and their survivors where injuries result from the use of such substances. Our research has revealed no published California case rejecting a claim by a drug (or alcohol) user on that ground.[14]

---

[14] In *Whittemore v. Owens Healthcare-Retail Pharmacy, Inc.* (2010) 185 Cal.App.4th 1194, a woman surreptitiously and illegally purchased prescription pain medications from an employee of the defendant pharmacy. After she became addicted, she and her husband sued the pharmacy on the ground that it had failed a legal duty to discover and report that the medications had been stolen, and to supervise its employee. (*Id.* at pp. 1196-1197, 1199.) The trial court sustained the pharmacy's demurrer without leave to amend, ruling that the doctrine of unclean hands barred plaintiffs from maintaining causes of action "'[b]ased on plaintiff's own illegal conduct in buying and taking medications for which she had no prescription and which she was aware were stolen.'" (*Id.* at p. 1197.) The Court of Appeal upheld the trial court's order applying the unclean hands doctrine, but did not publish that portion of its opinion. The published portion of the opinion addressed whether the plaintiffs could amend the complaint to allege a cause of action under the DDLA. (*Whittemore, supra,* at p. 1197.) The appellate court held they could not, as the DDLA required knowing participation in the marketing of illegal

(*Fn. continued on the next page.*)

19

However, for many years, California courts applied the rule that the sole proximate cause of injury to an intoxicated person or a third party hurt by an interaction with the intoxicated person was the latter's voluntary decision to consume alcohol. (See *Cole v. Rush* (1955) 45 Cal.2d 345, 356; *Lammers v. Pacific Electric Ry. Co.* (1921) 186 Cal. 379, 384.) The Supreme Court abrogated that rule in a series of cases beginning with *Vesely v. Sager* (1971) 5 Cal.3d 153 (*Vesely*), in which the court held that under modern negligence law, furnishing alcohol to an obviously inebriated person could be a proximate cause of injuries, and violate a duty of care owed to other persons injured by the intoxicated person (*Vesely*, *supra*, at p. 164; *Bernard v. Harrah's Club* (1976) 16 Cal.3d 313, 324-325; *Coulter v. Superior Court* (1978) 21 Cal.3d 144, 152), or to the intoxicated person himself. (*Ewing v. Cloverleaf Bowl* (1978) 20 Cal.3d 389, 400.) As discussed below, in response to these Supreme Court decisions, the Legislature acted to limit liability for those furnishing alcohol. Even before such legislation became effective, however, courts interpreted the principles of common law negligence to apply only to those who "'actually furnished alcohol,'" not those who "'permitted' the [intoxicated person] to drink" or "in some unspecified manner 'aided, abetted, participated and encouraged' the [intoxicated

controlled substances, and the defendant pharmacy "did not 'knowingly' participate in the marketing of the drugs to [the plaintiff wife]." (*Whittemore, supra,* at p. 1201.) As Jackson does not seek to bring his claim under the DDLA, but to establish a claim under common law, the published portion of *Whittemore* is of little assistance.

person] to drink." (*Sagadin v. Ripper* (1985) 175 Cal.App.3d 1141, 1157, quoting *Coulter v. Superior Court, supra,* at p. 155; accord, *Baldwin v. Zoradi* (1981) 123 Cal.App.3d 275, 279, 289 [affirming dismissal of claims against university based on its having "'knowingly permitted'" students to possess and consume alcohol, emphasizing the "obvious distinction" between "'giving'" or "'furnishing'" alcoholic beverages and "the failure to stop a drinking party or parties"]; *Bennett v. Letterly* (1977) 74 Cal.App.3d 901, 905 [defendant who contributed to common fund intended to be used to purchase liquor, but did not purchase liquor or exercise any control over it, could not be liable for injuries caused by those who consumed it]; *Caltrow v. Appliance Industries, Inc.* (1975) 49 Cal.App.3d 556, 569 ["Plaintiffs have cited no case and our independent research has revealed none indicating that mere acquiescence in another's activity or mere failure to protest or attempt to stop another from imbibing amounts to a furnishing of an alcoholic beverage"].)

In 1978, the Legislature acted to limit liability of those who furnish alcohol by amending the Business and Professions Code and the Civil Code. Business and Professions Code section 25602, subdivision (c) declares the Legislature's intent to abrogate the holdings in cases such as *Vesely, supra*, 5 Cal.3d 153, *Bernhard v. Harrah's Club, supra*, 16 Cal.3d 313 and *Coulter v. Superior Court, supra*, 21 Cal.3d 144, "in favor of prior judicial interpretation finding the consumption of alcoholic beverages rather than the serving of alcoholic beverages as the proximate cause of injuries inflicted upon another by an intoxicated person." Subdivision (b) of section

21

25602 provides that "[n]o person who sells, furnishes, gives, or causes to be sold, furnished, or given away, any alcoholic beverage pursuant to subdivision (a) of this section shall be civilly liable to any injured person or the estate of such person for injuries inflicted on that person as a result of intoxication by the consumer of such alcoholic beverage."  In cases of alcohol furnished to minors, Business and Professions Code section 25602.1 provides an exception to the civil immunity conferred by section 25602:  those holding liquor licenses -- or those required to hold such licenses but failing to obtain one -- may be held liable to third parties for "sell[ing], . . . furnish[ing], . . . giv[ing] . . . or caus[ing] to be sold, furnished or given away" alcoholic beverages "to any obviously intoxicated minor," where "the furnishing, sale or giving of that beverage to the minor is the proximate cause of the personal injury or death sustained by that person."

Civil Code section 1714, subdivision (c) similarly provides immunity from civil liability to "social host[s] who furnish[] alcoholic beverages to any person," stating that social hosts may not "be held legally accountable for damages suffered by that person, or for injury to the person or property of, or death of, any third person resulting from the consumption of those beverages."  Like Business and Professions Code section 25602.1, subdivision (d) of Civil Code section 1714, added in 2010, limits that immunity in cases involving minors, providing that "[n]othing in subdivision (c) shall preclude a claim against a parent, guardian, or another adult who knowingly furnishes alcoholic beverages at his or her residence

22

to a person whom he or she knows, or should have known, to be under 21 years of age . . . ."[15]  (Stats. 2010, ch. 154, §1, p. 2.)

Because Business and Professions Code section 25602, subdivision (b), and Civil Code section 1714, subdivision (c), specifically confer immunity from civil liability on persons who "furnish[]" alcoholic beverages, some litigants have argued that persons less directly responsible for the intoxicated state of another may be liable under nonstatutory theories.  Courts have uniformly rejected this argument.  For example, in *Allen v. Liberman* (2014) 227 Cal.App.4th 46, the deceased minor's parents brought a wrongful death action against the owners of the home where their daughter died of alcohol poisoning, under the theory that the homeowners had failed to supervise the girl.  The defendants had not furnished alcohol to the decedent; she had obtained it from their liquor cabinet after they went to bed.  The plaintiffs argued that social host immunity under Civil Code section 1714, subdivision (c), did not apply, "because there is no evidence that the [defendants] actually 'furnished'

_____

[15]     Like Business and Professions Code section 25602, subdivision (c), Civil Code section 1714, subdivision (b) makes clear the Legislature's intent to "abrogate the holdings" in cases such as *Vesely*, *supra*, 5 Cal.3d 153, *Bernhard v. Harrah's Club*, *supra*, 16 Cal.3d 313, and *Coulter v. Superior Court*, *supra*, 21 Cal.3d 144, "and to reinstate the prior judicial interpretation of this section as it relates to proximate cause for injuries incurred as a result of furnishing alcoholic beverages to an intoxicated person, namely that the furnishing of alcoholic beverages is not the proximate cause of injuries resulting from intoxication, but rather the consumption of alcoholic beverages is the proximate cause of injuries inflicted upon another by an intoxicated person."

the alcohol to [the decedent], as required by the statutory language."  The plaintiffs contended that if the social hosts "did not furnish alcohol . . . , the social host immunity statute does not apply and they may be held liable for negligently supervising [the decedent]."  (*Allen v. Lieberman, supra,* at p. 55.)  The court rejected this """"absurd"""" result, refusing to impose liability on parties who had merely "fail[ed] to lock up the liquor cabinet to prevent the minor from helping herself to alcohol."  (*Id.* at p. 56.)

Similarly, in *Elizarraras v. L.A. Private Security Services, Inc.* (2003) 108 Cal.App.4th 237, the plaintiffs were the parents of a minor who died while riding in a car driven by an 18-year old friend.  Both the decedent and her friend had become intoxicated at a club that had hired the defendant company to provide security.  The court found that although the defendant may have been employed in part to ensure that minors were not consuming alcoholic beverages, it owed no duty of care to the minors, as its job responsibility was "not equivalent to a legal duty of care to underage patrons to prevent them from drinking or driving while intoxicated."  (*Id.* at p. 244.)  Moreover, the court held, the exception to statutory immunity did not apply because the exception "requires malfeasance, not acquiescence or mere inaction."  (*Id.* at pp. 239, 243; accord, *Leong v. San Francisco Parking, Inc.* (1991) 235 Cal.App.3d 827, 832 [neither common law nor statute imposed liability on baseball team, parking corporation, or city and county for "simply permitting [intoxicated driver who injured plaintiff] to consume alcoholic beverages on [their] premises"]; see also *Rybicki v. Carlson* (2013) 216 Cal.App.4th 758, 763-764

[exception to immunity of Civil Code section 1714, subdivision (d), applies only to social hosts who furnish alcohol to minors at their residence; third parties may not be held liable for injuries caused by intoxicated minors under theories of "conspiracy" or "aiding and abetting" (*Rybicki v. Carlson, supra,* at p. 764)].)

More recently, some federal courts have held that under limited circumstances, liability could be imposed on third parties for injuries caused to persons who consumed illicit drugs or unlawfully obtained prescription drugs. In California, plaintiffs have been permitted to seek relief from defendants who supplied drugs or who abandoned a visibly incapacitated user. (See, e.g., *Kim v. Interdent, Inc.* (N.D. Cal. 2009) [2009 U.S. Dist. LEXIS 106686] [wife of dentist who died of Fentanyl overdose stated claim for negligence/wrongful death against company that had contracted with decedent to supply Fentanyl for use in his practice]; *Easley v. 3M Co.* (N.D. Cal. 2007) [2007 U.S. Dist. LEXIS 83149] [plaintiffs stated claim for negligence where defendants invited their daughter to their home to ingest inhalants, encouraged her to enter hot tub and left her there, alone and in an altered state, to drown].)[16] Our research

---

[16] Courts in other states have reached similar conclusions concerning those who supply drugs or who abandon a demonstrably incapacitated user of drugs. (See, e.g., *Tug Valley Pharmacy, LLC* (2015) 235 W.Va. 283, 284-285, 297 [773 S.E.2d 627] [persons addicted to prescription drugs not barred from pursuing civil action against doctors, a medical center and pharmacies under theory that defendants negligently "prescribed and dispensed controlled substance causing [the plaintiffs] to become addicted to and abuse
(*Fn. continued on the next page.*)

has revealed no case, however, suggesting that liability could be predicated on the mere failure to undertake affirmative efforts to stop the user from ingesting drugs. Accordingly, to the extent Jackson's claim is based on Klean's failure to monitor him more closely to prevent him from smuggling drugs into the facility and self-administering them, these authorities do not assist him.

The most recent California appellate authority in this area, *Sakiyama v. AMF Bowling Centers, Inc.* (2003) 110 Cal.App.4th 398 (*Sakiyama*), supports our view that a general failure to thwart drug use is not a basis for liability. There, the defendant landlord permitted an all night "rave" to take place on its premises. Four teenage girls attended, and at least two used Ecstasy. When they attempted to drive home, their automobile crashed into a tree, killing the driver and one of the passengers and injuring the other two girls. Applying the well-known factors described in *Rowland v. Christian* (1968) 69 Cal.2d 108, the court found that the defendant owed no duty of care to the injured girls or the survivors of the deceased girls for "promoting and producing [an] 'all night drug

the controlled substances"]); *Dugger v. Arredondo* (Tex. 2013) 408 S.W.3d 825, 826-827 [parents of young man who died after ingesting heroin at friends' house stated claim for negligence where defendants (decedent's friend and his parents) delayed calling 911 after decedent began choking and vomiting, and when paramedics finally arrived, withheld information about his use of drugs]; *Cook v. Kendrick, supra*, 931 So.2d 427-428 [parents of young man who died of drug overdose while at home of friend obtained recovery based in part on failure of friend to seek medical assistance for a significant period of time after observing decedent collapse].)

26

infested rave to teenagers . . . ."[17] (*Sakiyama, supra,* at p. 407.) "To impose ordinary negligence liability on a business owner that has . . . allow[ed] its facility to be used for an all-night party, even if we assume that [the defendant] knew that drugs would be used at the party, would expand the concept of duty far beyond any current models," potentially impacting every business that permits late night activities, including "bars, casinos, movie theaters, restaurants, and sporting events . . . ." (*Id.* at pp. 406, 412.) The court stressed that there was "no evidence that [the defendant] furnished [the girls], or anyone else, with drugs." (*Id.* at pp. 403, 407.) To the contrary, "[the defendant] and its security personnel took numerous steps to confiscate and remove both drugs and drug paraphernalia from the facility," including searching attendees twice, confiscating known drug paraphernalia such as surgical masks and vapor rub bottles, and ejecting identified drug dealers from the premises. (*Id.* at p. 403.) Citing *Baldwin v. Zoradi, supra,* 123 Cal.App.3d 275, the court stated: "[T]he policy of preventing future harm . . . [was] not as strong [in *Baldwin*] because of the

---

[17]      These factors are: "'[1] the foreseeability of harm to the plaintiff, [2] the degree of certainty that the plaintiff suffered injury, [3] the closeness of the connection between the defendant's conduct and the injury suffered, [4] the moral blame attached to the defendant's conduct, [5] the policy of preventing future harm, [6] the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability breach, and [7] the availability, cost, and prevalence of insurance for the risk involved. [Citations.]'" (*Sakiyama, supra,* 110 Cal.App.4th at p. 405, quoting *Rowland v. Christian, supra,* 69 Cal.2d at p. 113.)

lack of direct involvement with the furnishing of alcoholic beverages." [*Id.* at p. 290]. [¶] . . . The same analysis rings true in the instant case. There is no evidence that [the defendant] collaborated with anyone to encourage partygoers to use ecstasy or other intoxicants. Absent such evidence, and coupled with evidence that [the defendant] engaged in numerous measures to prevent drug use on its premises, the policy of preventing future harm is not strong in the instant case." (*Sakiyama, supra,* at p. 411.)

A similar analysis applies here. Klean is an unlocked substance abuse facility whose clients voluntarily seek non-medical treatment. It neither guarantees its program's success nor promises residents that it will prevent them from finding inventive ways to procure drugs and relapse. Far from warrantying that it will make drug use by its residents impossible, Klean's terms and conditions of admission acknowledge the possibility that residents may relapse; indeed, they make drug use a ground for termination from the program. We can imagine few facilities that would be willing to offer help to those addicted to drugs if they could be held liable for their residents' foreseeable but unpreventable predilection to obtain and ingest drugs.[18]

---

[18] As the *Sakiyama* court noted, foreseeability alone is not a ground for imposing a duty of care. (See *Sakiyama, supra,* 110 Cal.App.4th at p. 407 ["Virtually any consequence of an all-night party attended largely by teenagers was foreseeable. It was foreseeable that attendees would attempt to sneak drugs into the facility. It was foreseeable that attendees might purchase and use drugs. It was foreseeable that the partygoers would attempt to
(*Fn. continued on the next page.*)

The record establishes that Klean undertook reasonable measures to prevent Jackson from using drugs. He was searched on arrival, his room was checked periodically, and he was encouraged to attend therapy sessions and to engage in wholesome activities. Despite Klean's efforts, Jackson and his roommate surreptitiously smuggled drugs into their room and consumed them in the dead of night. Having them under supervision by an assigned staff member 24 hours a day or having their room under constant surveillance might have prevented this. But to impose a duty on Klean to employ extraordinary measures to prevent residents from obtaining and using drugs would, we believe, discourage it and similar facilities from undertaking the treatment of users who need it most. Jackson's claim that Klean could be held liable for failing to stop him from obtaining and using drugs has no support in common law, California case law, or reasonable public policy.[19]

---

drive home, either while impaired from drug use and/or from fatigue, if they stayed at the party all night long. [¶] . . . For that reason, foreseeability is not coterminous with duty"].)

[19]    Nor does Jackson's attempt to hold Klean liable find support in administrative regulations. Jackson cited a number of regulations governing licensed substance abuse treatment facilities to argue that Klean owed him a duty of care. (See fn. 4, *ante*.) Proof that a defendant violated an administrative regulation may give rise to a presumption of negligence under the doctrine of negligence per se. (Evid. Code, § 669; *Elsner v. Uveges* (2004) 34 Cal.4th 915, 927; *Ritter & Ritter, Inc. Pension & Profit Plan v. Churchill Condominium Assn.* (2008) 166 Cal.App.4th 103, 119.) However, a plaintiff must, at a minimum, "produce evidence of a
(*Fn. continued on the next page.*)

29

## B. *Claims Based on Failure to Monitor or Obtain Medical Care*

Although Jackson's complaint focused on Klean's failure to prevent his drug use, he also alleged that Klean was negligent in failing to discover he had overdosed until the morning after, suggesting more immediate medical attention might have lessened his injuries. Some cases have held that under certain circumstances, a third party may have a duty to protect a drug user from suffering further injury after drug use has rendered him incapacitated. (See, e.g., *Easley v. 3M Co.*, *supra*, [2007 U.S. Dist. LEXIS 83149]; *Dugger v. Arredondo*, *supra*, 408 S.W.3d 825; *Cook v. Kendrick*, *supra*, 931 So.2d 420.)

We find no basis for holding Klean liable under this theory. Jackson's roommate explained that he and Jackson waited until the late night bed check had taken place at 3:00 a.m. to inject the drugs. The evidence presented did not indicate whether staff checked on Jackson and his roommate between 3:00 and 7:00 a.m. Had a check been made, however, the monitor would have seen two men apparently asleep. A

---

violation of a statute [or regulation]" and evidence supporting "a substantial probability that the plaintiff's injury was caused by the violation." (*National Council Against Health Fraud, Inc. v. King Bio Pharmaceuticals, Inc.* (2003) 107 Cal.App.4th 1336, 1347, citing *Haft v. Lone Palm Hotel* (1970) 3 Cal.3d 756, 772.) As noted above, Jackson provided neither. Moreover, as discussed, the cause of his injury was his decision to defy the rules and procure heroin from an outside source. Accordingly, these regulations provide no support for his negligence claim.

30

residential drug treatment facility cannot be expected to employ staff to rouse its patients several times a night to ensure they are well.  Jackson claims the fact that he was sleeping in the couch should have alerted staff and resulted in some action.  But Dr. Coe testified that residents did not always sleep in their beds, and Jackson's roommate confirmed that Jackson slept on the couch "almost every night."  In short, neither the failure to more aggressively monitor Jackson after 3:00 a.m., nor the failure to discover he had overdosed until his roommate alerted the staff supports a claim against Klean.  Accordingly, Klean's motion for summary judgment on Jackson's complaint should have been granted.

## DISPOSITION

The petition is granted.  Let a peremptory writ of mandate issue directing respondent superior court to set aside that portion of its order of June 23, 2017 denying Klean's motion for summary judgment on Jackson's complaint, and issue a new order granting such motion.  Klean is awarded its costs.

**CERTIFIED FOR PUBLICATION**



MANELLA, J.


We concur:




EPSTEIN, P. J.




WILLHITE, J.

32